[No. 11097. *En Banc.* October 8, 1913.]

THE CITY OF SPOKANE, *Appellant*, v. SPOKANE & INLAND
EMPIRE RAILROAD COMPANY et al., *Respondents.*[1]

MUNICIPAL CORPORATIONS—POLICE POWERS—CHANGE OF GRADE—
ELIMINATION OF GRADE CROSSINGS. The power to compel grade sep-
arations is an exercise of the general police power of the city in
legislating for the general welfare and safety, and also in providing
for street grades and locating railroad and street railway lines
therein, under Rem. & Bal. Code, § 7507, subds. 7, 8, and 9.

RAILROADS — REGULATION — POWERS OF COMMISSION — CHANGE OF
STREET GRADES—EMINENT DOMAIN—ELIMINATION OF GRADE CROSSINGS.
The public service commission is not authorized to change city street
grades or exercise the power of eminent domain for the purpose of
eliminating railroad grade crossings in a city, by sections 9, 53, and
64 of the public service law of 1911, p. 538, which provide that it
shall be the duty of common carriers to construct safe trackage,
that the commission may determine what is safe, and that hearings
shall be had upon complaints as to tracks, switches, terminals, etc.,
and changes to promote the security and convenience of the public
and secure adequate facilities.

EMINENT DOMAIN—PUBLIC USE—CHANGE IN STREET GRADES—ELIM-
INATION OF GRADE CROSSINGS. Changes in grades of streets, deter-
mined upon as a matter of public welfare and safety, and the eleva-
tion of railroad tracks or other requirements to eliminate grade
crossings, are a public use authorizing the exercise of the power of
eminent domain by a city.

MUNICIPAL CORPORATIONS — IMPROVEMENTS — CHANGE OF GRADE —
ELIMINATING GRADE CROSSINGS — PROCEEDINGS — VALIDITY. An ordi-
nance requiring railroad companies to institute proceedings to change
street grades and eliminate grade crossings according to specified
plans and pay the cost thereof in such proportion as they may agree
upon or as may be determined by the courts, is void; since the city
cannot delegate its power of eminent domain to the companies, nor
shift the burden of apportioning the costs to the courts.

MUNICIPAL CORPORATIONS — IMPROVEMENTS — EMINENT DOMAIN—
COSTS OF CONDEMNATION—APPORTIONMENT. A city having instituted
eminent domain proceedings to change street grades and eliminate
railroad grade crossings, and having determined the entire cost and

[1]Reported in 135 Pac. 636.

expenses therein, can compel the railroad companies to pay such proportion of the costs as may be just, since their tracks create the dangerous situation making the change of grade a public necessity.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered January 22, 1913, dismissing a proceeding for a writ of mandate, upon sustaining demurrers to the complaint. Affirmed.

*H. M. Stephens*, for appellant.

*Graves, Kizer & Graves*, for respondent Inland Empire Railroad Company.

*Geo. T. Reid, J. W. Quick, L. B. da Ponte*, and *E. J. Cannon*, for respondent Northern Pacific Railway Company.

*F. M. Dudley*, for respondent Chicago, Milwaukee & Puget Sound Railway Company.

*Post, Avery & Higgins*, for respondent Washington Water Power Company.

MORRIS, J.—In July, 1912, the city of Spokane passed an ordinance whereby it required the Spokane & Inland Empire Railroad Company, the Northern Pacific Railway Company, the Chicago, Milwaukee & Puget Sound Railway Company, and the Washington Water Power Company, a local street railway company, to separate the grades of their tracks crossing Sheridan street, between Front and Olive avenues, and crossing Olive avenue near its intersection with Sheridan street

"from the grades of said streets and avenues by filling said streets and avenues, building retaining walls, abutments, viaduct, new bridge across and over the Spokane river, elevate the plane of said streets, and avenues, grade and fill the streets and avenues approaching or leading up to such separation of railroad tracks, from the surface or plane of said streets and avenues, of and for other traffic, and build, erect, construct and complete any and every other matter and thing required by or incident to, the profile, plans and

specifications for said work," (Spokane Ordinance, No. C877.) which profile, plans and specifications were incorporated into and made a part of the ordinance.

Section 2 requires the doing of all of this work by these several corporations at their own expense and the payment of all damages to adjacent property. Section 3 requires the work to be commenced within thirty days and completed within eighteen months; and section 4 requires the maintenance of the construction work by the several corporations.

The work was not undertaken by the several companies, each of them having notified the city of its intention not to comply with the ordinance. The city thereupon commenced this proceeding, praying the mandate of the court to issue requiring the several companies to comply with the provisions of the ordinance. Several demurrers were filed to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action. Each of these demurrers was sustained, and the city appeals.

The complaint, in addition to pleading the ordinance, sets forth that the city of Spokane contains over 100,000 inhabitants; that, through the midst of the city, runs the Spokane river, so dividing the city that about one-half of its population resides to the north of the river. That but few arteries of public travel cross the river by which this large population to the north may reach the business sections of the city. That one of these arteries is by way of Olive avenue, Sheridan street and Front avenue. That the Spokane & Inland Empire Railroad Company maintains and operates its tracks across Sheridan street between Front and Olive avenues, operating about sixty interurban passenger trains and about three hundred and eighty electric street cars over said tracks at said point every twenty-four hours; making, with the freight trains operated by the road, an average crossing every one and one-half minutes between

eight o'clock a. m., and five o'clock p. m., and carrying a daily average of eight thousand people.

That the Washington Water Power Company maintains a double-track street railway upon Front avenue between Grant and Sheridan streets, and thence on Sheridan street between Front and Olive avenues, operating a car over the crossing at Sheridan street and Olive avenue every six minutes and carrying a daily average of eighty thousand people.

That the Northern Pacific Railway Company operates a railroad track across Olive avenue, near its intersection with Sheridan street and crossing the tracks of the Spokane & Inland Empire Railroad Company, and of the Washington Water Power Company. All of the above tracks are upon the surface of the streets and avenues, greatly impeding public traffic upon the streets and rendering such streets and avenues extremely dangerous.

That the Chicago, Milwaukee & Puget Sound Railway Company operates its trains through a tunnel, crossing beneath Front avenue and Sheridan street, under a franchise which provides that, whenever the city should determine upon a separation of grades at this point, it would pay its equitable proportion of the cost of such separation, as determined and estimated by the city. A like provision is found in the Northern Pacific franchise.

Other allegations set forth the conditions of street traffic at the point in question; and after reciting that these various companies refuse to comply with the requirements of the ordinance or agree among themselves as to the portion of the expense to be borne by each, the complaint prays that the railway companies be required to proceed with the work in accordance with the plans and specifications adopted by the city, and that they share the entire cost and expense, including all damage to adjacent property that may be recovered, in such proportion as they may agree among themselves or the court determine.

It is stated in appellant's brief that the lower court sustained these several demurrers upon the ground that the ordinance pleaded as a part of the complaint was void, as not within the power of the city, and that, upon the authority of *State ex rel. Webster v. Superior Court*, 67 Wash. 37, 120 Pac. 861, the power to compel grade separations is exclusively vested in the public service commission of the state of Washington. We can find nothing in the *Webster* case that is decisive of any point here involved. We held in that case that the public utilities act of 1911 providing for a public service commission with power to establish rates and charges for public service corporations, was a "general law" within the meaning of §§ 10, 11, art. 11, of the constitution authorizing the adoption of charters for their own government by municipal corporations subject to general laws and providing for the enforcement of such police powers and regulations as are not in conflict with general laws; and that, under this "general law," the city of Seattle must yield its right to fix and control telephone rates to the public service commission. It was never intended by anything that was said in that opinion to take away the police power from cities of the first class, conferred upon them by the constitution and laws of this state, except in so far as the state, by its general law, had withdrawn that power and sought itself to exercise it. And so far as the authority of that case is concerned, or any other written by this court, it is still our opinion that cities of the first class have reserved to them all the powers conferred by constitution or statute, except in so far as such powers have been limited or withdrawn by legislative act. *Smith v. Spokane*, 55 Wash. 219, 104 Pac. 249; *Shepard v. Seattle*, 59 Wash. 363, 109 Pac. 1067, 40 L. R. A. (N. S.) 647.

That the power to compel grade separations is an exercise of the police power and a regulation affecting the public safety and welfare, seems so clear to us that we shall not attempt to support it by authority. In fact, except in so far

as it is contended that by "general law" the state has withdrawn this power from cities and vested it in the public service commission, respondents accept this as the law. It will be admitted that the state cannot divest itself of its police power, and whenever it has delegated such power to a municipality, it may, at its pleasure, assume such power and provide for its exercise; and based upon this principle, it was held in *Ewing v. Seattle,* 55 Wash. 229, 104 Pac. 259, and in *State ex rel. Webster v. Superior Court, supra,* that, though the power conferred upon the municipality could be traced to the constitution, yet the reservation "subject to the laws of this state," as found in § 10, art. 11, and "not in conflict with general laws" as found in § 11, was a reservation of all police power to the state to be exercised at its will; and when so exercised, the power granted to the municipality must yield.

In each of those cases, however, the court has found a "general law" by virtue of which the state has assumed to itself the power theretofore conferred upon the municipality. In the *Ewing* case, it was the act of 1907 authorizing cities to grant franchises to street railroads and to prescribe the terms and conditions thereof, which it was held superseded the provisions of the city charter of Seattle upon the same subject. In the *Webster* case, it was the public utilities act of 1911, vesting in the public service commission the power to regulate the rates of public service corporations which was held to supersede the rate fixing power exercised by the city of Seattle by ordinance.

The power to be exercised in providing for a separation of grades, as here attempted, is not only attributable to the general police power vested in the city in legislating for the welfare and safety of its citizens in dealing with an admittedly dangerous situation, but is referable to another power—that of providing for changes in the grades of streets and locating railroad and street railway lines thereon, providing for changes of grade in such locations and other like powers

as found in subdivisions 7, 8 and 9 of § 7507, Rem. & Bal.
Code (P. C. 77 § 83), *Spokane v. Thompson*, 69 Wash. 650,
126 Pac. 47.

Respondents cite many sections of the act of 1911 (Laws
1911, p. 538), upon which they rely as supporting their con-
tention that this act has divested the municipality of the
power sought to be exercised in this ordinance.  The main
reliance, however, is placed upon §§ 9, 53, and 64 of the act.
Section 9 (Laws 1911, p. 546), declares it to be the duty of
every common carrier to construct safe trackage to enable
it to safely transport all persons and to promote the safety
of its patrons and the public.  Section 53 (Laws 1911, p.
571), provides that, whenever the commission shall find that
the service of any common carrier in respect to the trans-
portation of persons is unsafe, the commission shall deter-
mine what is safe to be used and fix the same by its order.
Section 64 (Laws 1911, p. 578), is as follows:

*"Power of Commission to Order Repairs or Changes.*

"Whenever the commission shall, after a hearing had upon
its own motion or upon complaint, find that additional tracks,
switches, terminals, terminal facilities, stations, motive power
or any other property, apparatus, equipment, facilities or
device for use by any common carrier in, or in connection
with the transportation of persons or property, ought reason-
ably to be provided, or any repairs or improvements to, or
changes in, any theretofore in use ought reasonably to be
made, or any additions or changes in construction should
reasonably be made thereto, in order to promote the security
or convenience of the public or employees, or in order to se-
cure adequate service or facilities for the transportation of
passengers or property, the commission may, after a hear-
ing, either on its own motion or after complaint, make and
serve an order directing such repairs, improvements, changes
or additions to be made."  Laws 1911, p. 578, § 64.

We shall not attempt to so interpret these sections as to
define the powers therein vested in the commission.  We can-
not find in these powers, however they may be defined, any-
thing from which it can be held that the public service com-

mission has any power to change street grades, or to exercise the power of eminent domain, which must be exercised by some competent power before the separation of grades as outlined in the plans and specifications adopted by this ordinance can be made effectual.

The power of eminent domain is vested in all parties to this action, but each party must exercise that power for its own needs and purposes and not for the benefit of another. *State ex rel. Merriam v. Superior Court,* 55 Wash. 64, 104 Pac. 148. The changes in the grades of these respective streets, being determined upon as a matter of public welfare and safety, an undoubted public use, would furnish ample authority for the city to exercise its power of eminent domain. So to the requirement that railroad tracks be elevated on a viaduct, or depressed so as to go beneath the surface of the street, or other requirements made for the purpose of avoiding a dangerous crossing, would be an exercise of the police power, and a public use for which the city could exercise the power of condemnation. *Spokane v. Thompson, supra.*

And here is where we find the first vice in the ordinance. While we believe the city has the power to bring about the grade separation, and so hold in order that, its power being determined, the city may exercise that power in a proper way, this ordinance, however, is not an attempt on the part of the city to so change the grades of its streets or erect necessary viaducts and bridges as to cause a grade separation; but the city, by this ordinance, seeks to delegate this power to these respondents and requires them to institute the necessary legal proceedings to bring about the desired result. The respondents have no such power in the first instance, nor can the city delegate such power to them. Neither can the city enforce its demand that the respondents bear the cost and expenses of the work and pay all damages incident thereto "in such proportion as they may agree or the courts determine." This is an attempted delegation of police and legislative power. The city cannot confer its

power of eminent domain, upon which it must rest its power to change the grades of its streets, upon these railway companies, nor can it throw upon the courts the burden of determining in what proportion the companies shall share the financial burdens. No such power is vested in the courts of this state, as the power sought to be conferred is in no sense a judicial power, but a power which can only be exercised by the city through its duly constituted authorities.

If all that was here sought was to require these railway companies to construct a viaduct over their tracks, or provide some method of carrying their tracks across these streets that would eliminate the danger problem as far as possible, we believe authority could be found for such a requirement, but the city in this case is going farther in requiring these railway companies to institute condemnation proceedings to bring about changes of grade, and shifting the burden of apportioning the cost to the courts.

The city, having the power to bring about this grade separation, can institute the proper and necessary proceedings to that end in its own name, and having determined the entire cost and expense of such change, can compel these railway companies to pay such proportion of such cost as may be just, upon the equitable principle that the presence of the railway tracks creates the dangerous situation sought to be relieved and makes the change of grade a public necessity. *New York & N. E. R. Co. v. Bristol,* 151 U. S. 556; *Chicago, B. & Q. R. Co. v. Nebraska,* 170 U. S. 57; *Detroit, F. W. & B. I. R. v. Osborn,* 189 U. S. 383; *Woodruff v. Catlin,* 54 Conn. 277, 6 Atl. 849; *Chicago, B. & Q. R. Co. v. State,* 47 Neb. 549, 66 N. W. 624, 53 Am. St. 557, 41 L. R. A. 481. Many other cases announcing similar rules might be cited.

In *State v. Missouri Pac. R. Co.,* 33 Kan. 176, 5 Pac. 772, it is said:

"It is certainly fair and reasonable to impose the cost of restoring a street to safety and of maintaining such safety, upon those who, for their own convenience and profit, have

rendered the street unsafe; and it would certainly be unfair and unreasonable to impose such cost upon the public generally, or upon innocent owners of adjacent property."

Upon the first question submitted by the appeal, as to whether or not the power to bring about this grade separation rests with the city, we answer yes. Upon the second question, as to whether its attempt to do so as outlined in this ordinance is valid, we answer no. While, therefore, not wholly concurring in the view of the lower court, we are of the opinion that, upon the second point, its ruling is correct; and the judgment is sustained.

CROW, C. J., ELLIS, MAIN, MOUNT, FULLERTON, GOSE, and PARKER, JJ., concur.