[No. 22288. Department Two. May 27, 1930.]

THE CITY OF SPOKANE, *Respondent*, v. J. CARL
WILLIAMS *et al., Appellants.*[1]

[1]Reported in 288 Pac. 258.

*Lund & Dodds* and *A. O. Colburn,* for appellants.

*J. M. Geraghty* and *Alex M. Winston,* for respondent.

MITCHELL, C. J.—This action was brought by the city of Spokane, pursuant to an ordinance for that purpose, to acquire, by eminent domain proceedings, certain lands declared to be necessary for the protection of its source of water supply and the extension of its airport. The property sought to be acquired consists of 16.78 acres described as lots 17, 18, 19 and 20, First Addition to Orchard Park, Spokane county. Defendants O. W. Cowles and wife owned one of the lots and held the other three under real estate contracts with the owners, J. Carl Williams and wife and Preston L. Gordon and wife, the other defendants. Nearly all of the property is situated outside the city limits, and adjoins the existing municipal airport.

The action took the usual course, including an order of necessity, which was followed by an assessment by a jury of compensation to be paid for the taking of

the property in the sum of $450 per acre, upon which verdict judgment was entered. The city paid the amount awarded, together with costs, into the office of the clerk of the court for the benefit of the owners, whereupon an order of appropriation was duly entered by the court in favor of the city. The defendants, jointly, have appealed.

The first and one of the principal arguments on behalf of the appellant is, in substance, that the chief purpose for taking the property is to enlarge the municipal airport, notwithstanding the city's declaration of purpose to protect its water supply, and that the city has no right, power or authority to go beyond the territorial limits of the city to condemn and take property for airport purposes. The case may be considered, in our opinion, with respect to the power of the city as though the sole object and purpose of the city was to improve and extend its present airport.

Appellants seem to rely solely upon the airport statute, Laws of 1925, Ex. Ses., p. 30 (Rem. 1927 Sup., § 905-1), in contending that, since that statute does not specifically provide for the taking of property outside the city limits, therefore the power to do so for that purpose has been withheld. However, resting the question on that one statute is not justified. That statute was but a further expression of the legislature which, together with existing statutes upon the subject, gave and was intended to give cities like Spokane power to keep abreast with the increasing modern demands for air transportation. There was no need to repeat in the airport act all existing statutory powers such cities already enjoyed, but only to supplement them, if necessary, by specifically authorizing them to acquire, maintain and operate airports, to purchase, condemn or lease property therefor, and declaring "the same to be a city and county purpose and public use."

Spokane is a city of the first class. The legislature has been liberal in giving powers to such cities and providing ways and means to make those powers enforceable. The legislature of 1890 (Laws of 1890, p. 218, § 5) conferred a great many powers on cities of the first class. That section is now Rem. Comp. Stat., § 8966. Subdivision 6 provides that such city shall have power:

"To purchase or appropriate private property *within or without its corporate limits,* for its *corporate uses,* upon making just compensation to the owners thereof, and to institute and maintain such proceedings as may be authorized by the general laws of the state for the appropriation of private property for public use; . . ."

In the case of *State ex rel. Kent Lumber Co. v. Superior Court,* 35 Wash. 303, 77 Pac. 382, Seattle was condemning a right of way over certain lands outside the city to be used for pole and transmission lines for an electric lighting plant the city was constructing for its use, under authority in another subdivision of the same section. Speaking of subdivision 6 of the statute, it was said it "clearly authorizes the city to condemn private lands, either within or without the city, for such uses; . . ."

From time to time after the act of 1890, commencing in 1893 and as late as 1915, the legislature enacted certain laws applicable at first to cities of the first class and later other cities as well, specifically extending to them the right of eminent domain for the taking and damaging of land for public purposes, etc. The law in this respect as it now appears is Rem. Comp. Stat., § 9215. It provides:

"Every city . . . is hereby authorized and empowered to condemn land and property, including state, county and school lands and property for streets, avenues, . . . within the limits of such city, and

to condemn land or property, or to damage the same, *either within or without the limits of such city* for public parks, . . . and to condemn land and other property and damage the same for such and for any *other* public use after just compensation having been first made or paid . . ."

Then in the extraordinary session of 1925 (Laws of 1925, Ex. Ses., p. 30; Rem. 1927 Sup. § 905-1) the legislature, amending § 1, ch. 48, Laws of 1919, p. 102, Rem. Comp. Stat., § 905-1, in other respects, provided:

"Section 905-1. That all cities and counties are authorized and empowered by and through their appropriate corporate authorities to acquire, maintain and operate sites and other facilities for landings, terminals, housing, repair and care of airplanes and seaplanes for the aerial transportation of persons, property or mail; and to acquire by purchase, condemnation or lease all lands and other property necessary therefor, and to dispose of such lands and other property for public use whenever acceptance thereof on behalf of the United States for aviation purposes shall be authorized by act of Congress; *and the same is hereby declared to be a city and county purpose and a public use.* Cities and counties are hereby empowered to acquire lands and other property for said purpose by the exercise of the power of eminent domain under the same procedure as is or shall be provided by law for the condemnation and appropriation of private property for any of their *respective corporate uses,* and no property shall be exempt from such condemnation, appropriation or disposition by reason of the same having been or being dedicated, appropriated or otherwise held to public use."

These proceedings were commenced in October, 1928, and thereafter the legislature of 1929 (Laws of 1929, p. 180, § 1) amended § 1, chap. 48, Laws of 1919, p. 102, Rem. Comp. Stat., § 905-1, just above referred to, the amendment being immaterial, however, so far as these proceedings are concerned.

These statutes, all of which must be considered in disposing of the question presented, constitute in our opinion direct authority for these proceedings, although the property to be acquired lies outside the limits of the city.

 Notwithstanding an assignment and argument on the part of the appellants to the contrary, the instructions of the court on the subject of compensation to be allowed for the property taken were, in our opinion, correct. Those instructions are as follows:

"In determining what compensation you shall allow the defendants for the land so desired to be taken, you are simply to determine what is its fair market value in cash at the present time. By fair market value, is simply meant the value which would be placed on the land if it were offered for sale by one who desired to sell, but was under no necessity to sell, and that would be paid by one who desired to buy, but who was under no necessity to buy the land, and the price agreed upon between such willing seller and willing buyer would be the fair market value. In this connection, I may say that it would not be proper for you to take into consideration any peculiar value which the land may have to the owners, apart from what it would have to the public generally; nor must you consider the owners' unwillingness to sell the land, if such unwillingness appears from the evidence. On the other hand, you must not consider the value of the land to the city apart from what it would be to the public generally for that purpose, nor must you consider the necessity or the need of the city to have this particular land, if such appears in the evidence; but, as I have stated, you should bear in mind the simple case of a willing buyer and a willing seller, neither being under necessity to buy or sell the land, and as I said a moment ago, the price agreed upon by them would be the fair market value.

"In determining the value of the land, you may take into consideration not only the present and past uses or capabilities of the land, if shown by the evidence,

but also any use to which the land may reasonably be put in the immediate future, if such appears from the evidence; but this does not mean that you should consider any uses that are remote, or imaginary, or vague or speculative, even though such may have been mentioned or testified to by witnesses; nor must you consider any value that might be suggested for the land in exceptional or unusual instances or under peculiar circumstances, not shown to exist and which do not tend to show the fair market value of the land; but as to any future uses you must be careful to consider only such as are reasonably probable.''

Appellants requested an instruction upon certain of the elements involved on the question of compensation, and assign as error the refusal of the court to give that instruction. Manifestly counsel mention this assignment by oversight, because the record shows that instruction No. 4 given by the court is in legal effect precisely the same as the one requested by the appellant.

A rejected offer to prove by the appellant Cowles the cost of removing loose rock from the land is assigned as error. The ruling was right, in our opinion, for the reason it was not shown that the witness possessed qualifications sufficient to testify upon that subject. All the information he had was what others had offered to do it for; and immediately by another witness appellants did prove the reasonable cost, and there was no contradiction of such testimony.

There was no prejudicial error in not allowing appellant Cowles to testify as to the size of several other airports mentioned compared with the area of the land to be taken in this proceeding. The sufficiency of the area to be used as a private airport was, of course a matter of opinion upon which experts might testify, but the comparing of the area of the land to be taken in this case with that of other airports

in the country was a collateral matter, not involved in the issues in this case.

Nor was there any error in sustaining objections to the question if there would be any objection from a physical standpoint of building hangars on this property so that airships could be wheeled out into the airport field if there were no regulations against it; that question was purely theoretical, and in this respect a number of other assignments of error such as those relating to where at the present time is the "most natural hangar district for the port," and the value of different places around the field compared with others for the purpose of erecting hangars, may all be disposed of by the general statement that patrons of the field, whether they be owners of property abutting upon it or not, have no right in making use of the field to enter it with their ships except at places and in the manner provided by the rules and regulations of the city or its managers and agents in control of the field, which regulations may be changed from time to time as necessity and safety may require.

After appellant Cowles had testified to the present market value of one of the lots in controversy, there was no error in requiring him to say on cross-examination how much he paid for that property three years before on the ground that it was too remote in point of time. The matter of remoteness of time simply appealed to the discretion of the trial court. Nor was there any error in not allowing a witness to testify as to the increase of property values near airports in Oakland, California, and Salt Lake City, Utah. There was no issue calling for such testimony.

While it appears that the court refused to give an instruction as requested by the appellant with reference to the airport being open to the public, which right should be taken into consideration in determin-

ing the value of appellants' property, there was no error in such refusal, because the matter, to the extent it was involved, was properly and sufficiently covered by an instruction given by the court in language of its own choosing.

Another assignment questions instruction No. 4¾ given by the court. Obviously this was inadvertently included in the assignments of error, as no exception was taken to the giving of that instruction.

Calling attention to what they term insufficient compensation allowed by the jury, appellants contend that they did not have a fair trial. There was considerable testimony as to the different purposes and uses to which the property was adaptable and suitable, and it appears that the city's expert witnesses, who were cross-examined by the appellants, fixed values upon the property in answer to questions for that purpose in about the following form:

"What, in your opinion, for any purpose to which you think it is adapted, is that land worth per acre?"

There was no objection to the form of the question, nor was there any objection to the qualifications of the city's several expert witnesses upon that subject. On behalf of the appellants, it is argued that they

". . . introduced testimony showing that the land had a use as a site for hangars and as a private landing field, and that the city put in no testimony to rebut this."

Some of the city's witnesses valued the property at much less than the verdict, while the appellants and other witnesses placed the values many times greater than the verdict; and the argument appears to be that, as the city did not rebut or dispute appellants' proof as to the suitability of the property for the special purposes mentioned, therefore the failure of the jury to fix values substantially in the amount testified to by

appellants' witnesses was so clearly indicative of lack of a fair trial that a new trial should be granted by the court. However, we cannot agree to the contention. Each side submitted its views as to values; under direction of the court the jury viewed the premises; the court fully, fairly and correctly instructed the jury as to the law; the verdict is well within and supported by evidence the jury was at liberty to believe; we find no indication of passion or prejudice; the trial court denied a motion for a new trial upon this and all other grounds mentioned in the motion for a new trial; and in our opinion there was a fair trial.

Objection is made to the sufficiency and form of the verdict, because it is $450 per acre instead of that amount multiplied by the number of acres taken. There was no dispute worth mentioning between the parties as to the area taken. According to plats introduced in evidence without objection, a computation was made showing 16.755 acres, which was carried into the judgment, while the only other testimony on the subject was that of the appellant Cowles, who testified that his computation was 16.780 acres. This very slight discrepancy against the appellants, from the viewpoint most favorable to them, which does not appear to have been called to the attention of the trial court at the time the judgment was signed, should not and will not be allowed to disturb the judgment or the costs in this court. Properly speaking, the fixing of the amount of the compensation to be included in the judgment in this case was a mere matter of computation, and falls within the rule mentioned in the case of *Buffington v. Henton,* 70 Wash. 44, 126 Pac. 58.

Affirmed.

Main, Fullerton, French, and Holcomb, JJ., concur.