[No. 25832. Department One. March 20, 1936.]

HARRY R. STOVER, *Respondent and Cross-appellant,* v. WINSTON BROS. COMPANY, *Appellant.*[1]

[1]Reported in 55 P. (2d) 821.

*Evans & McLaren* and *J. Speed Smith,* for appellant.

*Vanderveer & Bassett,* for respondent and cross-appellant.

Tolman, J.—This is an action to recover wages for work performed by the plaintiff and a large number of other workmen whose claims were assigned to him, in the construction of the "Diablo Dam," pursuant to a contract between the defendant corporation and the city of Seattle.

The case was tried to the court sitting without a jury, resulting in findings and conclusions favorable to the plaintiff and a judgment thereon for upwards of seventy thousand dollars. The defendant has appealed from that judgment, and the plaintiff has cross-appealed upon a minor issue. For convenience, therefore, we will refer to the parties as plaintiff and defendant.

We are confronted in this case with an enormous record, which able counsel have discussed in 629 pages of printed briefs, containing many skillfully constructed theories designed, for the most part, to convince us that plaintiff cannot recover at all. To discuss these theories severally and in detail, or even to clearly state each one of them, would manifestly be impossible within permissible limits, and we therefore must be content to set forth, as lucidly as we may, our theory of the case, buttressed with a few citations, and trust to its soundness to demonstrate that all theories leading to a different result must necessarily be unsound.

The facts in their general features are not in dispute and will be outlined as briefly as possible. In August, 1930, the city of Seattle, pursuant to ordinance, called for proposals for the construction of the dam in question and submitted to prospective bidders printed forms embodying plans and specifications for the work, together with a form of proposal to be used by the bidder and a form of contract to be entered into by the successful bidder. In these, it was pro-

vided expressly that the laws of the state and the charter and ordinances of the city should be incorporated in the contract.

The defendant submitted its proposal in the form required, which was accepted. On September 17, 1930, the formal contract was executed, which, by its terms, incorporated the provisions of the city charter and the city ordinances as to wages for labor and provided that the defendant's employees on the work should be paid not less than the current rate of wages paid by the city itself for work of like character. In the specifications, also made a part of the contract, was a provision reading: "When possible, residents of the city of Seattle are in all cases to have preference as employees upon the work." The defendant, as required by the contract, gave a bond "for the use of said city and also for the use of all persons who may perform or cause to be performed any work or labor," conditioned upon the performance of the contract in accordance with its terms, but the surety was not made a party to this action.

During the time when the work was in progress, the ordinances of the city of Seattle fixed the wages of carpenters at $9 per day and building laborers, or carpenters' helpers, at $5.60 per day of eight hours, and one and one-half times that rate for all time when men were employed in excess of eight hours in any calendar day and also on holidays. Notwithstanding all this, the defendant paid to carpenters on the work eighty cents per hour without any overtime allowance, and to building laborers, or carpenters' helpers, sixty-five cents per hour without any overtime allowance. The difference between the wages actually paid and the wages specified by the city ordinances and which were by the contract agreed to be paid, was

the basis upon which the trial court determined the amount of the recovery.

It seems to be conceded that the city had the power to construct this dam to serve its purposes, although far beyond · and outside of its territorial limits.

Rem. Rev. Stat., § 8966 [P. C. § 678], among other things, provides that a city of the first class, such as the city of Seattle, shall have power

"3. . . . to acquire, by purchase or otherwise, such lands and other property as may be necessary for any part of the corporate uses provided for by its charter, . . ."

and

"15. To provide for lighting the streets and all public places, and for furnishing the inhabitants thereof with gas or other lights, and to erect, or otherwise acquire, and to maintain the same, or to authorize the erection and maintenance of such works as may be necessary and convenient therefor, and to regulate and control the use thereof;"

Rem. Rev. Stat., § 9488 [P. C. § 1214] also authorizes any incorporated city to construct water works within or without its limits for the benefit of its inhabitants. Such powers have often been upheld by this court. *State ex rel. Kent Lumber Co. v. Superior Court,* 35 Wash. 303, 77 Pac. 382; *Malette v. Spokane,* 77 Wash. 205, 137 Pac. 496, 51 L. R. A. (N. S.) 686, Ann. Cas. 1915D, 225; *Langdon v. Walla Walla,* 112 Wash. 446, 193 Pac. 1; *Spokane v. Williams,* 157 Wash. 120, 288 Pac. 258; *Municipal League of Bremerton v. Tacoma,* 166 Wash. 82, 6 P. (2d) 587; *Blade v. La Conner,* 167 Wash. 403, 9 P. (2d) 381; and *State ex rel. Walla Walla v. Clausen,* 157 Wash. 457, 289 Pac. 61.

In the last cited case is language which makes clear the principle upon which the present issues must be determined. It is there said:

"The rule that a municipal corporation cannot exercise its governmental authority outside its limits has nothing to do with the case at bar. While a city cannot exercise governmental authority outside its corporate limits, the municipality may exercise its right to own and use property for legitimate city purposes outside its boundaries."

It is likewise conceded that the city may by ordinance fix and declare a public policy in the matter of wages and conditions of labor on public works which will be effective within its territorial limits. *Smith v. Spokane,* 55 Wash. 219, 104 Pac. 249; *Shepard v. Seattle,* 59 Wash. 363, 109 Pac. 1067, 40 L. R. A. (N. S.) 647; *Seattle v. Goldsmith,* 73 Wash. 54, 131 Pac. 456; *Spokane v. Spokane & Inland Empire R. Co.,* 75 Wash. 651, 135 Pac. 636.

We shall therefore cheerfully assume, for present purposes, that such an ordinance has no effect and cannot be enforced beyond and outside of the territorial limits of the city where enacted. So then, clearly, the city had the power to fix wages and working conditions upon public works within the city by ordinance and had exercised that power.

The city was undertaking public works beyond its territorial limits, as it had a right to do, and by contract it undertook to fix wages and working conditions on such public works in harmony with a like situation within the city. The reason for doing so and the advantages to be gained thereby are apparent. Labor for the construction of the dam was to be drawn largely from the city, and these contract stipulations strengthened and supported the public policy adopted by ordinance within the city and, in addition thereto,

would bring an increased flow of money from payroll disbursements back to the city of Seattle. Also, the increased pay tended both directly and indirectly to advance the interests of the wage earning classes resident within the city.

The city was prosecuting this work in its proprietary capacity, and, so far as we have discovered, when the city acts in that capacity, it has the same right and power to contract with reference to the subject that a private corporation or an individual would have under like circumstances. The city therefore had a right to insert in the contract any condition or conditions (not in themselves unlawful) which might be deemed beneficial or advantageous to it or to its citizens. The contractor, with full knowledge, accepted and agreed to the conditions dictated by the city, and on those conditions the contract price to be paid to the contractor was fixed.

It would seem that the contractor, by reason of these facts, is not now in a position to question the power of the city or to repudiate the terms of the contract. Certainly, the contractor may not now assert that his constitutional right to contract upon the matter of wages has been impaired. The constitutional right freely to contract was exercised by the contractor when the contract with the city was executed, and having thus contracted to pay wages at certain rates, the contractor may not complain because thereafter he could not lawfully violate the conditions to which he had already agreed by procuring laborers to work for less than the agreed compensation.

The case of *Moran v. Thompson*, 20 Wash. 525, 56 Pac. 29, read in connection with the provisions of the city charter fixing the powers of the board, seems to rather conclusively answer the contention that the board of public works had no power to insert the

minimum wage clause in the contract; but if that case is not conclusive, still, after the work had been completed and paid for and the contractor had obtained all of the benefits flowing to him from the contract, surely he is estopped from now asserting any such lack of authority.

But it is urged that, in any event, the workmen are not third parties for whose benefit the contract was made, and that none of them can now maintain a suit thereon.

Article XXIII of the city charter provides in §1:

"In all public works done by or for the city, either by day's work or by contract, eight hours shall constitute a day's work; . . ."

and in § 2 is the provision:

"Every contractor and subcontractor performing any local or other improvement work for the city of Seattle, shall pay or cause to be paid to his employes on such work or under such contract not less than the current rate of wages paid by the city of Seattle for work of like character. . . . This article shall be enforced by the city council by ordinance."

Ordinance No. 38415, upon which this action is based, enacts the charter provision above quoted and provides a penalty for its violation.

Laws of 1899, chapter 101, p. 163 (Rem. Rev. Stat., § 7642 [P. C. § 3459], *et seq.*), provides:

"Hereafter eight hours in any calendar day shall constitute a day's work on any work done for the state or any county or municipality within the state, . . ."

and chapter 44, Laws of 1903, p. 51 (Rem. Rev. Stat., § 7645 [P. C. § 3461]), declares the public policy of the state to be:

". . . that all work 'by contract or day labor done' for it, or any political subdivision created by its laws, shall be performed in work days of not more

than eight hours each, except in cases of extraordinary emergency. . . ."

A later ordinance of the city of Seattle relating to local improvements provides, in effect, that the workman shall have a cause of action against the contractor for the difference between the specified wages and the amount actually received. This ordinance, enacted after the execution of the contract here involved, by its terms relates only to local improvements and is the ordinance that was involved in the case of *Goebel v. Elliott,* 178 Wash. 444, 35 P. (2d) 44. The provision giving a cause of action to the workman against the contractor cannot, therefore, be applied in this case, but we must look to ordinance No. 38415, which was in effect when the contract was made and is pleaded in plaintiff's complaint, as being the governing ordinance. This ordinance covers "local or other improvement work for the city." It contains no provision expressly creating a cause of action in favor of the workman, but provides a penalty only for its violation.

The effect of the minimum wage provision of the city charter, ordinance No. 38415, and of the contract entered into by the defendant with the city, all in harmony with the public policy declared by state legislation, was to place in the hands of the defendant moneys paid to it by the city for the express purpose of paying the wages so specified. The payment to the contractor did not, of course, create a trust fund in the hands of the city, and the situation cannot be likened to those cases such as *Preston v. Forrestal Co.,* 150 Wash. 340, 272 Pac. 975, and *United States Fidelity & Guaranty Co. v. Montesano,* 160 Wash. 565, 295 Pac. 934, where funds in the hands of the city, due under the contract, were claimed by laborers and materialmen. Therefore, it is vitally necessary to

determine whether the laborers may, in the absence of an express provision by ordinance or in the contract, maintain this suit for the unpaid portion of their wages.

There is a well-recognized rule to the effect that, whenever the law recognizes a right, it gives a remedy, and this rule applies to statutory as well as to common law rights. 1 C. J. 986.

Here we have a situation known to the contracting parties which made it the duty of the contractor to pay the city wage scale to all workmen who might be employed. The contract, by its terms, required such payment to a designated class and was as explicit as it possibly could be made at the time it was entered into. While, incidentally, the city might receive benefits therefrom, its main purpose was, without doubt, to provide to the workmen an adequate wage. This subject is treated extensively in 2 Street on Foundations of Legal Liability, p. 152 *et seq.*, and after discussing the earlier cases and the English rule based upon the theory that none but those in privity with the consideration can maintain an action on such a promise, because of the inadequacy of the common law action of assumpsit, the author proceeds at page 157:

"Turning to the state of New York we find that here, as in Massachusetts, there was some early recognition of the right of the third person to sue. The doctrine was placed upon the insecure authority of *Dutton v. Pool* [1 Vent. 318, 332]. The question was not, however, presented for elaborate consideration until the important and leading case of *Lawrence v. Fox* (1859) [20 N. Y. 268] arose. The right of a third person to sue on a contract made for his benefit was by that case fully established. This decision constitutes a new point of departure in American contract law, and, as said in 1876 by the Supreme Court of the United States, the doctrine there laid down now pre-

vails in the greater number of the American states.

"The reason why the New York court could advance where the Massachusetts court has been compelled to beat a retreat is manifest. In 1848, forms of action had been abolished in New York and complete theoretical equilibrium between remedial law and contractual liability was thus established. The procedural difficulty no longer remained. To a mind trained under the new procedure, the conclusion reached in *Lawrence v. Fox* is just as logical and just as inevitable as the contrary conclusion reached in jurisdictions where the forms of action are still in existence. . . .

"In applying the modern doctrine that the stranger to the consideration may sue upon a contract made for his benefit, the American courts have in a sense acted unconsciously. Being trained in the atmosphere of the new procedure, they have been forced to sustain the right of action, but they have not, it must be said, clearly perceived the ground on which their action is to be upheld. We consequently find that our courts are usually content to take hold of any plausible theory which seems to be adequate to the decision of each particular case, failing to look deep enough to see the underlying principle. The theories of 'agency,' 'trust,' and 'property rights' have served this purpose.

"The test most frequently proposed is that found in an intention on the part of the contracting parties to bestow a benefit on the stranger. 'The contract,' it is said, 'must be made for his benefit as its object, and he must be the party intended to be benefited.' But, as Professor Williston has clearly shown, this test is, like the others, inadequate; for in many cases the interest of one of the contracting parties is much more obviously intended to be protected than the interest of the third party. Such is the case where one contracting party exacts of the other a promise to assume and pay a debt.

"Another phenomenon illustrates the failure of the American courts fully to grasp the true reason for permitting the stranger to sue. This is found in the fact that *Lawrence v. Fox* has been followed in states

where the old forms of action remain, while in still other jurisdictions, it seems, as in England, the old doctrine prevails notwithstanding the introduction of the new procedure. It will be found that on the whole the code states have been quickest to respond and these have become the chief protagonists of what is now known as the American doctrine."

This being a code state recognizing but one form of action in civil cases, it seems obvious that we should and must follow the so-called American doctrine.

Exhaustive notes on this subject will be found in 77 A. L. R., beginning at page 21, and in 81 A. L. R., at page 1271. From the first mentioned volume, we quote:

"In *Federal Surety Co. v. Minneapolis Steel & Machinery Co.* (1927; C. C. A. 8th) 17 F. (2d) 242 (later appeal in (1929; C. C. A. 8th) 34 F. (2) 270), the court stated: 'The right of the third person to maintain an action on the contract in his own name is in a sense remedial, but the right to sue depends upon the substantive right of such third party under the contract. It depends upon whether the obligation of the contract creates a direct liability from the promisor to the third person in his own right, and not in the right of another.' . . .

"In any event, if the right of a third party to recover on a contract made for his benefit is once admitted, it is not essential that he be named in the contract or that his identity be ascertained at the time the contract is made, so long as he is one of the class of persons for whose benefit the contract is made. *R. Connor Co. v. Aetna Indem. Co.* (1908) 136 Wis. 13, 115 N. W. 811; *Woodhead Lumber Co. v. E. G. Niemann Investments* (1929) 99 Cal. App. 456, 278 Pac. 913.

"Where the public contractor's bond is conditioned for the benefit of laborers and materialmen, 'the third party need not be ascertained or known at its inception to entitle him to the benefits thereof. The third party may adopt it when he becomes informed, and may enforce it at law as if originally made by his

express authority.' *R. Connor Co. v. Aetna Indem. Co.* (1908) 136 Wis. 13, 115 N. W. 811.''

With full knowledge of what the obligation was, the contractor, for a valuable consideration, agreed to pay his workmen when employed according to a specified wage scale. Notwithstanding that no workman was a party to the consideration, we must hold that all workmen were, by the contract, given a substantive right, the right to receive the specified wage, which right was a direct liability of the contractor to the workmen, and therefore the workmen may sue on the contract in their own right.

The mere fact that the surety on the contractor's bond was not made a party to this action should not change the rule or its results. The principal must be liable before the surety can be held, and the mere failure to join the surety should not release the principal.

Our own cases of *Union Machinery & Supply Co. v. Darnell,* 89 Wash. 226, 154 Pac. 183, and *Zioncheck v. Hepden,* 144 Wash. 272, 257 Pac. 835, while differing somewhat on the facts, clearly, we think, recognize the principle here involved and are authority for our present views.

No case is cited and we have found none which is exactly similar on the facts, but, in our judgment, the facts of this case bring it well within the American doctrine, and we are therefore bound to hold that the action may be maintained.

The case of *Horstmann Co. v. Waterman,* 103 Wash. 18, 173 Pac. 733, 1 A. L. R. 856, and the cases from this court therein cited, are clearly distinguishable upon the facts, and none holds contrary to what is here expressed.

Some errors are assigned which raise questions of fact relating to the classification of the workmen, their

rate of pay and the like. A reading of the record convinces us that the evidence does not preponderate against the findings made by the trial court upon these matters, and those findings must therefore stand.

■ The next question raised is as to the statute of limitations. Does the two-year, the three-year, or the six-year statute apply? Rem. Rev. Stat., § 155 [P. C. § 8160] *et seq.* The six-year limitation, § 157 [P. C. § 8162], applies to:

"2. An action upon a contract in writing, or liability express or implied arising out of a written agreement."

Since we have just determined that the written contract between the city and the contractor was so far made for the benefit of the workmen as to permit them to sue thereon, it must necessarily follow that the liability arises out of the contract, and therefore the six-year statute must apply. *Caldwell v. Hurley,* 41 Wash. 296, 83 Pac. 318.

■ One of the workmen named De Rosie assigned his claim to the plaintiff in manner and form precisely as all of the other workmen did, but before the suit was actually commenced De Rosie died. Thereafter, and while the suit was pending, probate proceedings were commenced, an administratrix was appointed, and she, on behalf of the De Rosie estate, executed a new assignment. The defendant questions the recovery which was permitted on this claim.

An assignment of a chose in action vests the title in the assignee, who may sue thereon in his own name. If that title is sufficient to permit the assignee to maintain an action on the claim at the time it was made, then it continues to be sufficient notwithstanding the subsequent death of the assignor. The assignment by the administratrix was unnecessary and superfluous, but it did not vitiate the original assignment.

The cross-appeal by plaintiff questions the ruling of the trial court refusing to allow interest prior to the entry of the judgment. This question is to be answered by determining whether the claims were liquidated or unliquidated. A very substantial part of the plaintiff's case in chief was made up of testimony tending to show the nature of work done by the several claimants in order to establish a classification and a rate of pay other than that shown by defendant's payrolls. With the classification and therefore the rate of pay in dispute and undetermined, the amount of each claim was necessarily unliquidated.

Finding no error, the judgment is affirmed on both appeals. The plaintiff will recover his costs incurred in the defense of the defendant's appeal.

MILLARD, C. J., MITCHELL, STEINERT, and GERAGHTY, JJ., concur.

