[No. 47556-3. En Banc. December 24, 1981.]

*In the Matter of the Petition of*
THE CITY OF SEATTLE.

THE CITY OF SEATTLE, *Appellant,* SHERMAN CLAY
& CO., ET AL, *Respondents.*

*In the Matter of the* WESTLAKE PROJECT.

*Douglas N. Jewett, City Attorney, Ellen D. Peterson, Assistant,* and *Wickwire, Lewis, Goldmark & Schorr, O. Yale Lewis, Jr., Thomas J. Brewer,* and *William H. Block,* for appellant.

*Bogle & Gates, Delbert D. Miller, Elaine L. Spencer,* and *Patricia H. Char,* for respondents Sherman Clay, Berco, Edison Brothers Store, et al.

*Lucas A. Powe* and *Thomas W. Bingham,* for respondent Fidelity Mutual Savings Bank.

*Ferguson & Burdell* and *Thomas J. Greenan,* for respondent Mall, Inc.

*William L. E. Dussault* on behalf of Washington Coalition of Citizens With Disabilities and *James R. Ellis* and *Catherine B. Roach* on behalf of the Downtown Seattle Development Association and the Seattle Building and Construction Trades Council, amici curiae for appellant.

ROSELLINI, J.—This proceeding concerns a municipal improvement called the Westlake Project, proposed by the City of Seattle, a first–class city. The action was begun by the respondents, who are owners and lessees of properties located within the area which the project would embrace. They sought a judgment declaring invalid the ordinance adopting the project and providing for condemnation of property within the area (Seattle City Ordinance No. 108591). Before the suit was heard, the City initiated condemnation proceedings to acquire plaintiffs' property, and the actions were consolidated.

After hearing extensive evidence, the trial court found,

*inter alia,* that the project was not authorized by statute, and did not constitute a public use. A number of the court's rulings are challenged on this appeal, but inasmuch as we affirm the trial court upon these two grounds, we do not reach the remaining issues.

The respondents ask the court to dismiss the appeal as moot. They point to the fact that during the pendency of this action, contracts which form an integral part of the project, particularly a contract with the Seattle Art Museum, have expired by their own terms. The court is assured, however, that the City intends to proceed with the undertaking if the court declares it valid. It is confident that it can renew the contract with the art museum and secure the other contracts needed to complete the project. That being the case, the matter is still in controversy and is not moot.

Pine Street in Seattle, between 4th and 5th Avenues, is fronted by retail stores which have been there for many years. The monorail, an elevated passenger service which runs to the Seattle Center, has its downtown terminal at that point. Westlake Avenue has been closed to traffic in recent years and converted to a mall, where public gatherings take place from time to time. There is on–street parking on Pine Street in this area; 60 percent of city buses travel to this point to disgorge shoppers, and the area is in the heart of the retail shopping center, three large department stores being situated in the immediate vicinity. The Mayflower Hotel stands at 4th and Olive, and just south of it is a large piano store. There is presently a walkway, called Fidelity Lane, which runs through the buildings in this block to make it easier for shoppers to walk from Frederick and Nelson on 5th Avenue to The Bon Marche on 4th Avenue.

The City proposes, in its Westlake Project, to acquire an area roughly between 4th and 5th on the east and west, and between Stewart and Pine on the north and south. The project would include the Times Square Building, considered an architecturally and historically significant building.

A history of the development of the project follows:

The 1973 report of Mayor Wes Uhlman's committee which studied the Westlake Mall area stated that the retailing function of the area should be strengthened to forestall the decay experienced by the retail cores of other cities. The other objective cited was the creation of public space, aesthetically satisfying, which could provide a center for general pedestrian–oriented amenities both day and night. The committee concluded, however, that this objective should not be at the expense of the retail function. Westlake, the report said, offered a unique opportunity for locating this space in that it was centrally located in the middle of a high–density retail population and included a substantial public space at present.

It was proposed that the project should be designed and accomplished jointly with interested property owners and businessmen, because of the interdependence of the two goals.

Following his election, Mayor Royer, in 1978, appointed a citizens' committee to study the Westlake Project. The mayor proposed a project concept which substituted the Seattle Art Museum for hotel space which had been previously contemplated. Under the proposed plan, the museum, a private nonprofit corporation, will occupy the space rent free, as it presently occupies buildings owned and maintained by the City in Volunteer Park and the Seattle Center.

Pursuant to ordinance, the Department of Community Development advertised for developers to prepare plans for the project. The application of Mondev U.S.A., Inc. (Mondev) was accepted.

In August 1979, the Westlake Development Authority (formed pursuant to RCW 35.21.660 and governed by a council appointed by the mayor), the Seattle Art Museum, and Mondev entered into a tripartite agreement which established the parties' responsibilities for implementation of the project, specifying how the project was to be constructed, leased, operated and maintained.

After at least 13 public committee meetings and an evening public hearing at which the plaintiffs testified, the City adopted ordinances providing for the execution of a contract between the City and the Westlake Development Authority and providing that the City acquire, construct and equip through the Authority the revised project, with Mondev as the developer. In 1980 Westlake Associates, a limited partnership composed of Daon Corporation, Mondev and the Seattle Art Museum was substituted for Mondev as developer. An amended tripartite agreement was made between the Westlake Development Authority, the Seattle Art Museum and Westlake Associates.

Architectural plans for the project remain at the "pre-schematic" stage, but currently show the following project elements:

A. A triangular public park of approximately 25,000 square feet;

B. Additional exterior public open spaces, including covered arcades, sidewalks, plazas, rooftop garden and courtyard, and a rooftop terrace;

C. A public parking garage with short–term parking spaces;

D. A new monorail terminal of approximately 4,600 square feet accessible to the public;

E. An art museum in the new structure (approximately 130,000 gross square feet) and the adjoining Times Square Building devoted to galleries, children's museum, auditorium, curatorial spaces, museum shop, library, and administrative and support functions;

F. Retail and cinema space (approximately 186,000 square feet of gross leasable space) occupying four floors of the new building; and

G. Interior circulation systems of approximately 45,000 square feet.

The ordinance declared that the construction of the proposed project was required for the health, safety, convenience and welfare of the public, that the property to be acquired was for a public use, and that the expenditure of

funds therefor was for a public purpose.

To fully understand the scope of the project, it is necessary to set forth the participants and the method of financing.

Westlake Associates is a Washington limited partnership composed of Daon Corporation as general partner with a 50 percent ownership interest, the Seattle Art Museum as a limited partner with a 30 percent ownership interest, and Mondev as a limited partner with a 20 percent ownership interest.

The financial structure of the Westlake Project was principally determined by six contracts: (1) the agreement between the City of Seattle and the Westlake Development Authority for the development of the Westlake Project; (2) the amended tripartite agreement for the Westlake Project between the Westlake Development Authority, the Seattle Art Museum and Westlake Associates; (3) the Urban Development Action Grant of April 4, 1979, as amended; (4) the limited partnership agreement of Westlake Associates; (5) the contract for project coordination services; and (6) the City–Museum Agreement 1931 as amended.

Those contracts obligate the City to acquire all properties necessary for the project, and transfer all properties north of Pine Street to the Westlake Development Authority, either by deed or by 99–year lease; to build and maintain a proposed park south of Pine Street; to pay all costs of relocating businesses, moving utilities and revising traffic patterns; to build a temporary monorail terminal; to operate and maintain the permanent monorail terminal; and to transfer $1.26 million of proceeds from city bonds to the Westlake Development Authority.

As of April 1980, the City estimated its cost of the Westlake Project would equal $17,809,000. The City intended to finance its obligations by issuance of $12.6 million of general obligation bonds, use of $975,000 from the Forward Thrust bond issue, receipt of $3,463,000 of Urban Development Action Grant funds and $771,000 from other sources.

The Westlake Development Authority agreed to have the project built in accordance with plans prepared by Mitchell/Giurgola in September 1978, and to pay its net revenues, if any, from the project to the City. Westlake Associates has no obligation to the City of Seattle to repay any city expenses.

The Westlake Development Authority is required to renovate the Times Square Building and lease the entire building without cost to the Seattle Art Museum for an initial term of 66 years for use as part of the museum facility, allowing the museum to sublet the remaining commercial space in that building to others as a source of income.

In the new building to be constructed, the Westlake Development Authority is obligated to lease to the museum air rights, storage and other space for an initial term of 66 years upon which the museum will construct its new museum facility above the new shopping center. The "consideration" for the two museum leases is that the art museum is obligated to build and maintain its new museum, keeping it open to the public according to lease provisions, maintain the north plaza, the Times Square Building and the common spaces adjoining its museum space. It is to pay a share of the cost of maintaining the elevators and escalators, its agreed share of the common costs, and taxes on the Times Square Building. The museum is required to pay no rent for the lease of air rights or the Times Square Building.

The Westlake Development Authority is obligated to lease to the developer for a period of 66 years the air rights (together with subterranean rights for retail storage, loading docks and mechanical rooms) necessary for it to build its retail shopping center. It is also obligated to construct the parking garage and lease it to the developer for 20 years; to construct the sidewalks, the arcades, the north and south plazas, the roof gardens off of the fourth floor of the shopping complex and the lowest museum floor, and the monorail terminal, and to pay 21.2 percent of the cost of interior malls, elevators, escalators, and other common

costs, and 20.5 percent of indirect costs of the project, the developer to pay the remainder.

The developer is obligated to build and maintain the retail shopping center which will occupy 3½ floors of the new building. Until the developer's revenues from the retail shopping center exceed $4 million, the developer must pay the Westlake Development Authority for the air rights on which it builds the shopping center the greater of $50,000 plus the Westlake Development Authority's debt service costs from construction of the Authority's portion of the improvements on the property (except for those costs attributable to the garage construction) or $375,000. After the developer's revenues from the retail shopping center exceed $4 million annually, it must pay a percentage of those excess revenues to the Westlake Development Authority.

For the first 4 years of the garage lease, the developer must pay the greater of the Westlake Development Authority's debt service costs attributable to construction of the garage or $251,000. Thereafter, if the developer operates the garage itself, it must pay the Westlake Development Authority the greater of the Authority's debt service attributable to the garage or $251,000 or 55 percent of its gross revenues. A different formula applies if the developer sublets the garage to an operator.

Const. art. 1, § 16 (amendment 9) provides:

§ 16 EMINENT DOMAIN. Private property shall not be taken for private use . . . Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public *shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public*: . . .

(Italics ours.)

■ The acquisition of land through eminent domain proceedings must be for a public use. Under the constitutional provision, the question whether the proposed acquisition is for such a use is a judicial question, although a

legislative declaration will be accorded great weight. *Des Moines v. Hemenway,* 73 Wn.2d 130, 437 P.2d 171 (1968).

Here, there has been no legislative pronouncement on the subject. Still the declaration of the city council to the effect that the project was required for the health, safety, convenience and welfare of the public and that the property to be acquired was for public use is also entitled to respect. However, the evidence which was presented to the trial court did not substantiate the City's declaration.

In order for a proposed condemnation to meet the constitutional requirement of Const. art. 1, § 16, the court must find (1) that the use is really public, (2) that the public interests require it, and (3) that the property appropriated is necessary for the purpose. *King County v. Theilman,* 59 Wn.2d 586, 593, 369 P.2d 503 (1962).

It is stipulated that this is not an urban renewal case, as in *Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963).

According to exhibit 4, the mayor's Westlake Advisory Committee in 1973 established the following goals for the Westlake Project:

1. Westlake Goals and Opportunities. The Westlake area offers an opportunity to achieve the following major objectives of the City:

(a) Retailing. At present the primary function of the Westlake area is retailing. This function is highly desirable and should be strengthened to forestall the decay experienced by other cities' retail cores. The general aim should be to make this retail core the finest shopping center in the Pacific Northwest with both local and regional attraction. Measures to accomplish this goal include encouraging additional investment, . . .

(b) Public Space. Seattle, as a major urban center, needs a downtown focus point, an aesthetically–satisfying space as a point of public pride which can provide a center for general pedestrian–oriented amenities, both in the daytime and at night. Westlake offers a unique opportunity for locating this space in that it is centrally located, in the middle of a high–density retail population and includes a substantial public space at present.

2. Interdependence of Goals. A project to achieve these goals in the Westlake area can be accomplished only by a

cooperative effort of city and private interests. Not only will retail goals be defeated if the public space is designed so that it impairs the retail function, but proper design and development of surrounding commercial structures is essential to success of the public space. Since each aspect of the project should not only [not] detract but enhance the others' function, any project in the area must be jointly designed and accomplished.

Exhibit 4, at 3–4. These goals have remained the principal goals of the Westlake Project throughout all subsequent planning, according to the findings of the trial court.

The witnesses who testified for the City at the trial upon whom the court relied for its findings maintained that the project would not be feasible unless there was a viable shopping center. For example, one witness testified that the goal and objective of the City was to

"[d]evelop a downtown focal point which is an aesthetically satisfying space and fosters a sense of public pride and a retail goal [to] strengthen the retail core to become the finest shopping center in the Pacific Northwest with both local and regional attraction."

Report of Proceedings, at 612–13.

The court found that:

5. The retail shops within the Westlake Project are a substantial element of the project and are an essential part of the Westlake Project and this urban focal point. The retail element of the project cannot be separated from the Project's other elements in the project as now designed to make the project economically feasible and to accomplish the intended purpose of the design.

. . .

21. The sidewalks, arcades and interior circulation spaces in the Westlake Project are similar to and serve a similar function to the sidewalks, arcades and interior circulation spaces in private shopping centers such as Northgate and Southcenter, stores and other mixed use buildings, including allowing for circulation of customers, providing for display of goods for sale, connecting the retail shops, acting as a "pedestrian street," providing for relaxation and cultural events, and providing amenities which draw customers.

22. The roof gardens, plazas, museum, monorail termi-

nal and park spaces will stimulate pedestrian traffic in the area. Pedestrian traffic is of benefit to retail stores.

. . .

37. One of the purposes of the Westlake Project was to create a project at the Westlake site which would not damage the surrounding retail uses and would aid in strengthening the 26-block area of Seattle identified as the retail core. It was also intended to function with the nearby department stores (The Bon Marche, Frederick & Nelson and Nordstrom) to create a shopping center with both local and regional attraction.

. . .

45. If the retail space is removed or reduced in size, the Project would not accomplish its intended purpose and would not be financially feasible. Some of the other uses could be eliminated or modified and the project could still accomplish its designed function.

Clerk's Papers, at 694, 697, 700, 701.

■ It may be conceded that the Westlake Project is in "the public interest". However, the fact that the public interest may require it is insufficient if the use is not really public. A beneficial use is not necessarily a public use. *State ex rel. Oregon–Washington R.R. & Navigation Co. v. Superior Court,* 155 Wash. 651, 657–58, 286 P. 33 (1930); *Hogue v. Port of Seattle,* 54 Wn.2d 799, 825, 831, 837–38, 341 P.2d 171 (1959).

Only the constitutions of Arizona, Colorado and Missouri have provisions similar to the Washington State Constitution. Like the Washington Constitution, the question whether the contemplated use be really a public use shall be a judicial question and determined as such without regard to any legislative assertion. Cases from other jurisdictions holding that a legislative pronouncement of public use is controlling, are not helpful.

■ If a private use is combined with a public use in such a way that the two cannot be separated, the right of eminent domain cannot be invoked. *State ex rel. Puget Sound Power & Light Co. v. Superior Court,* 133 Wash. 308, 233 P. 651 (1925).

Therefore, where the purpose of a proposed acquisition is

to acquire property and devote only a portion of it to truly public uses, the remainder to be rented or sold for private use, the project does not constitute public use.

Here the trial court found as a fact, upon convincing evidence, that the retail shops were a substantial element of the project, essential to its functioning; that the sidewalks, arcades and interior circulation spaces in the project are similar to and serve a similar function to those in private shopping centers; that the public features will stimulate pedestrian traffic in the area, benefiting the retail stores and that these stores were intended to function with the nearby department stores to create a shopping center with both local and regional attraction.

The City cites *In re Port of Seattle,* 80 Wn.2d 392, 495 P.2d 327 (1972), contending that it supports the City's alleged right to acquire land by condemnation for lease to private individuals for retail shopping businesses. In that case the Port sought to acquire land adjoining the airport for use for air cargo storage. It appeared that some of these facilities might be leased to private parties. We found that the port district had express statutory authority to acquire land for use for airport purposes, including storage and transfer facilities (RCW 53.04.010, RCW 53.08.020, and RCW 14.08.030). Also we found that the Port had express statutory authority to lease its facilities to private parties. RCW 53.08.080. While private entrepreneurs might be utilized to effectuate the Port's purpose, that purpose—air cargo storage and transfer—was nevertheless a public one. We distinguished *Hogue v. Port of Seattle,* 54 Wn.2d 799, 341 P.2d 171 (1959), where this court had held that the same port district had no authority to condemn land for industrial development, pointing out that there the proposed use was private in nature; the proposal was to sell the land to private parties rather than to lease it, and that the proposed construction of air cargo facilities was an integral part of an airport operation which served a public purpose. Also, we pointed out in a footnote that the impact of *Hogue* had been substantially modified by the adoption of article

8, section 8 (amendment 45) to the Washington Constitution, which reads in pertinent part: "The use of public funds by port districts in such manner as may be prescribed by the legislature for industrial development or trade promotion . . . shall be deemed a public use for a public purpose . . ."

Here there is no express statutory authority for the proposed project—a retail shopping center—and that purpose is not a public one. Furthermore, there is no constitutional provision evidencing the people's understanding that such undertakings constitute a public purpose.

We conclude that the proposed project contemplated a predominantly private, rather than public, use.

The City strenuously argues that since it has the statutory authority to condemn land for public squares, parks or museum purposes, and off–street parking, this project is a public use. Were the retailing functions only incidental to those uses, a different question would be presented. However, the evidence shows, as the trial court found, that the primary purpose of the undertaking was to promote the retail goal. Not only is this not a public use, but we find no statutory authority for such an undertaking.

A municipal corporation's power to condemn is delegated to it by the legislature and must be conferred in express terms or necessarily implied. Statutes which delegate the State's sovereign power of eminent domain to its political subdivisions are to be strictly construed. *Des Moines v. Hemenway,* 73 Wn.2d 130, 437 P.2d 171 (1968); *State ex rel. Devonshire v. Superior Court,* 70 Wn.2d 630, 424 P.2d 913 (1967). However, as we said in *Devonshire,* a statutory grant of such power is not to be so strictly construed as to thwart or defeat apparent legislative intent or objective.

The appellant has directed our attention to no statute which evidences a legislative intent that municipalities can erect a retail shopping facility or condemn land for that purpose.

We said in *Des Moines* that a statute delegating

eminent domain power to a municipal corporation, containing both specific enumerations and general provisions, should be interpreted so no portion of it is superfluous, void, or insignificant, and when the specific enumerations of power are followed by words granting general power, the specific enumerations govern the character or nature of the subject matter to be included within the words granting general powers.

Speaking of RCW 8.12.030 and RCW 35.24.310 (specifically granting to third–class cities the power of eminent domain), we said that the general language "any other public use" and "any other public purpose" meant uses and purposes "of the same character or nature as those uses and purposes enumerated in the statutes, *i.e., public* uses and purposes." *Des Moines,* at 134–35. In that case it was sought to condemn tidelands for a marina. It was conceded that a marina is a public use. The use in that case was authorized by RCW 35.23.455, although that statute did not expressly authorize condemnation. Since it was the evident legislative intent to grant such power under the general language of RCW 8.12.030 and 35.24.310, read in conjunction with RCW 35.23.455, the city was authorized to condemn land for that purpose.

In *Devonshire,* the City of Seattle, pursuant to express statutory authority (RCW 35.22.305, Laws of 1965, ch. 132, § 1), had created a separate municipal department for the administration, management and control of a civic center, which had then been constructed as a site for the Seattle World's Fair. The statute provided for authority to operate public transportation facilities "heretofore or hereafter erected primarily to serve such civic center." Taking this provision in conjunction with RCW 8.12.030, giving the power of eminent domain with respect to specified uses and "any other public use", we concluded that the legislature must have envisioned that the City would acquire the monorail system and must have intended that it would be vested with the power to purchase or condemn, if required, such appurtenant easements as were necessary for its

operation.

In *King County v. Seattle,* 68 Wn.2d 688, 414 P.2d 1016 (1966), we strictly construed RCW 8.08.010–.080, authorizing counties to condemn land and property for public use within their boundaries, holding that it does not give the right to condemn land belonging to the state or its subdivisions, regardless of the use to which it is to be put. On the other hand, in *Seattle v. State,* 54 Wn.2d 139, 338 P.2d 126 (1959), a city's authority to condemn, for waterworks purposes, state lands not devoted to a public use was recognized, where a statute expressly conferred that power.

In *Tacoma v. Welcker,* 65 Wn.2d 677, 399 P.2d 330 (1965), the City, in an effort to preserve the purity of the Green River which supplied the City's water needs, brought actions to condemn certain privately owned property lying within the watershed. It was contended that the City had no authority to condemn for that purpose. However, RCW 8.12.030 authorized it to condemn land for the purpose of protecting its supply of fresh water from pollution, and RCW 35.92.010 bestowed a similar power. It was not there denied that the City had the power of eminent domain to protect its water supply, but rather that its decision to exercise that power over the particular properties in question was arbitrary and capricious. It was conceded that there was no polluting of the stream at the moment, but the City desired the property in order to guard against future contamination. We held that the City acted reasonably in determining that the taking was necessary.

*Spokane v. Williams,* 157 Wash. 120, 288 P. 258 (1930) is another case in which this court considered the scope of a city's power to condemn private property. The City of Spokane sought in that case to condemn land outside its limits for airport purposes. Although the State specifically gave to cities the authority to acquire, maintain and operate airports, and to purchase, condemn or lease property therefor, declaring the same to be a public use (Laws of 1925, 1st Ex. Sess., ch. 42, p. 30), the property owners contended that the authority given could only be exercised within the City's

boundaries. This court held, however, that the statute should be read in conjunction with Laws of 1890, p. 215, § 5 (now RCW 35.22.280(6)), which gave the City power to appropriate private property within or without its corporate limits for its corporate purposes.

In *Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963), we upheld a legislative declaration of public use, even though private individuals would ultimately benefit from the condemnation authorized in that case, which was designed to correct urban blight. There the power to condemn was specifically conferred in the act which defined the evils to be corrected and gave cities the power to determine the existence of blighted areas within their environs.

Of course, as we recognized in that case, not every legislative declaration of public use will survive scrutiny by the court, which has, under the constitution, the responsibility of determining whether the "use be really public." Thus, in *Hogue v. Port of Seattle,* 54 Wn.2d 799, 341 P.2d 171 (1959), we found invalid a portion of a statute providing for the establishment of industrial development districts, finding that it authorized the acquisition of land for private purposes.

Cases from other jurisdictions which have come to our attention, in which courts have upheld the acquisition of property under the power of eminent domain for lease to private parties, have all involved statutory grants of specific powers. *See Berman v. Parker,* 348 U.S. 26, 99 L. Ed. 27, 75 S. Ct. 98 (1954) (housing redevelopment); *Frostburg v. Jenkins,* 215 Md. 9, 136 A.2d 852 (1957) (industrial development); *Lerch v. Maryland Port Auth.,* 240 Md. 438, 214 A.2d 761 (1965) (trade center); *Courtesy Sandwich Shop, Inc. v. Port of N.Y. Auth.,* 12 N.Y.2d 379, 190 N.E.2d 402, 240 N.Y.S.2d 1 (1963) (trade center).

In holding that the power of eminent domain, when exercised by a municipality, must be derived from an express legislative grant or necessarily implied, this court applies the general rule. *See* 11 E. McQuillin, *Municipal Corporations* §§ 32.15, .16 (3d rev. ed. 1977); 29A C.J.S.

*Eminent Domain* § 22 (1965).

It will be seen that in all of the cases where this court has found an implied grant of the power of eminent domain, there has been an express legislative grant of the authority to undertake the project, thus evidencing a legislative finding that the particular action authorized serves a public use. Taken together, these cases stand for the proposition that the general language of RCW 8.12.030—"for any other public use"—is restricted to uses which are of the same kind as those enumerated in the section or which are specifically authorized by the legislature.

Here, the proposed project includes a number of elements for which the exercise of the power of eminent domain is expressly authorized. The City has the statutory authority to condemn property for a public square (RCW 8.12.030) and that portion of the project which is reserved for a public parking garage (at least at ground level) would fit that description. *See* definitions of "public square" in 35 Words and Phrases, *Public Square* (1963), which describe a square as an open space, sometimes occupied by a public building, such as a courthouse. *And see* 10 E. McQuillin, *Municipal Corporations* § 28.38 (3d rev. ed. 1981), where it is said that public squares are held in trust for the use of the public. *Webster's Third New International Dictionary* 2214 (1966) defines a square as an "open place or area formed at the meeting of two or more streets".

Condemnation for parks is also authorized under RCW 8.12.030, and RCW 35.86.030 grants the power of eminent domain for the purpose of acquiring real property for off–street parking facilities, to provide parking for persons using such parks or civic center facilities. Power to condemn for monorail purposes has also been granted. *See State ex rel. Devonshire v. Superior Court,* 70 Wn.2d 630, 424 P.2d 913 (1967). Finally, the power to condemn for art museum purposes is contained in RCW 35.21.020.

There is, however, no statutory authority to establish or to condemn property for an urban "focal point", or an urban shopping center, or facilities to be leased for pri-

vate use as retail establishments, restaurants, or theaters.

While the legislature has authorized the leasing of areas above the surface of the ground, of real property *owned* by it and not limited to a particular use (RCW 35.22.302), it has not authorized a city to acquire property for the purpose of leasing it for uses such as these.

Were these private uses only incidental to the public uses for which the land is condemned, a different question would be presented. *See Miller v. Tacoma, supra; In re Port of Seattle,* 80 Wn.2d 392, 495 P.2d 327 (1972).

While the motives of the city council are not questioned, and the court found as a fact that the City did not act arbitrarily, capriciously or fraudulently in planning this project, the fact remains that one of the project's principal features, if not indeed the chief one, is to provide additional shopping opportunities in the core of the City's shopping area. It is admittedly designed to enhance and to forestall "flight to the suburbs". However well intentioned the project may be, it is obvious that an essential part of it was not authorized by the legislature. That being the case, the City's contentions cannot prevail.

Likewise, the trial court was correct in holding that the project was not a public use.

The judgment is affirmed.

BRACHTENBACH, C.J., and HICKS, WILLIAMS, and DORE, JJ., concur.

STAFFORD, J. (concurring)—I agree with the majority. The Westlake Project is primarily a private undertaking, intended fundamentally for private use. As such the City may not, under article 1, section 16 of the Washington Constitution, acquire land for the project through eminent domain proceedings. That resolves the sole issue.

The balance of the majority's opinion embarks on a discussion of whether there is statutory authority to permit such action. I fear such discussion may foster an erroneous impression that the Legislature may have the power to

authorize condemnation proceedings for private projects or to delegate such authority to municipalities. The state constitution expressly prohibits the taking of any property for a project which is primarily private in nature. Legislative pronouncements to the contrary are meaningless and the presence or absence thereof are unnecessary to a resolution of the case before us.

I also concur with the observation of the majority that the instant case is not in conflict with *In re Port of Seattle,* 80 Wn.2d 392, 495 P.2d 327 (1972). There, the Port's project fell within a specific constitutional provision declaring a public use for a public purpose. Article 8, section 8 (amendment 45) reads in relevant part:

> The use of public funds by port districts in such manner as may be prescribed by the legislature for industrial development . . . shall be deemed a public use for a public purpose . . .

In the instant case no constitutional declaration of a public use for a public purpose exists. If it did and if it had the constitutionally authorized legislation we would have a different case. Unfortunately, the City of Seattle does not have the same constitutional support as the Port of Seattle.

Thus, I concur with the majority solely on the constitutional grounds it expresses.

UTTER, J. (dissenting)—The Westlake Project will serve a "public use"; and, as designed, it is constitutionally and statutorily permissible. The trial court's finding of no public use, see finding of fact No. 8, is in effect an erroneous conclusion of law which is not binding upon us. The legally requisite public use is not vitiated by the private use or purchase of condemned property. By holding otherwise the majority overrules *In re Port of Seattle,* 80 Wn.2d 392, 495 P.2d 327 (1972) and *Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963). It also undermines the public purpose analysis of *United States v. North Bonneville,* 94 Wn.2d 827, 621 P.2d 127 (1980) and *Anderson v. O'Brien,* 84 Wn.2d 64, 524 P.2d 390 (1974).

I

The project is for a public use, as evident from both the substance and the chronology of the other factual findings. The trial court found that the project would forestall inner-city decay, would create necessary public space, and would result in a museum, a public park, public parking, an auditorium, and a library. It specifically found:

4. The City of Seattle intended that creation of an urban focal point as designed for the Westlake Project would, among other things, relocate and improve the monorail terminal, create public parks and open spaces, increase diverse pedestrian traffic in the area, increase city tax revenues, possibly decrease crime in the area by reason of the pedestrian traffic, create accessible shopping, transportation and recreational facilities for the handicapped, create a center of activity for Seattle, and increase civic pride, all as more particularly described in Ordinance 108591. It appears that there is a reasonable prospect that the Westlake Project would accomplish many of these purposes.

5. The retail shops within the Westlake Project are a substantial element of the project and are an essential part of the Westlake Project and this urban focal point. The retail element of the project cannot be separated from the Project's other elements in the project as now designed to make the project economically feasible and to accomplish the intended purpose of the design.

. . .

7. The City's reason for acquiring the entire site for the Westlake Project, and controlling the entire development was its belief that public ownership of the underlying land is necessary for implementation of the public improvements and for assuring that such new private development as might take place on the Project site will be functionally, operationally, architecturally and aesthetically compatible with, and complementary to, the public facilities.

8. The Westlake Project as designed is not a public use.

Finding of fact No. 8 does not follow from findings of fact Nos. 4, 5, and 7, and, in fact, appears inconsistent with them. By itself, it offers no reason for its pronouncement; it

only reflects the trial court's erroneous understanding of the law. These findings do not, therefore, support a conclusion of no public use.

## II

The majority's constitutional analysis is predicated upon a literal reading of *State ex rel. Puget Sound Power & Light Co. v. Superior Court,* 133 Wash. 308, 233 P. 651 (1925). But that case, besides being distinguishable from this one, does not require the majority's result and, if it did, it would be inconsistent with recent constitutional developments.

*Puget Sound* is factually distinguishable. Unlike this case, it did not involve a private use necessary to effectuating a public purpose. At issue was the ability of a power company to construct transmission lines to provide electricity for both private and public consumption. The court repeatedly emphasized that the company had surplus generating capacity even without the condemnation.

The facts of *Puget Sound* illustrate that the broad language of that case, upon which the majority relies, cannot be given a literal application. Other cases applying the *Puget Sound* analysis make this clear. *See, e.g., Tacoma v. Nisqually Power Co.,* 57 Wash. 420, 107 P. 199 (1910); *State ex rel. Harris v. Superior Court,* 42 Wash. 660, 85 P. 666 (1906); *see also Tacoma v. Humble Oil & Ref. Co.,* 57 Wn.2d 257, 356 P.2d 586 (1960); *State v. Larson,* 54 Wn.2d 86, 338 P.2d 135 (1959); *State ex rel. Eastvold v. Superior Court,* 48 Wn.2d 417, 294 P.2d 418 (1956). For example, in *Nisqually Power,* Tacoma was permitted to condemn certain lands and water rights for the purpose of generating electric power, even though during nonpeak hours a substantial amount of that power was to be sold to private enterprise. Both public and private uses were involved; but, because the public use necessarily required an arrangement of that sort, the condemnation was permissible. That case reflects the long–standing principle, not repudiated by *Puget Sound,* that any taking is constitutional if reasonably

necessary to the effectuation of a public use. *See also Humble Oil, supra; Larson, supra; Eastvold, supra.*

Moreover, our recent cases indicate that we no longer follow, if we ever did, the majority's use of *Puget Sound.* A condemnation is not illegal simply because private enterprise is allowed to either purchase or lease the acquired land. *See, e.g., In re Port of Seattle,* 80 Wn.2d 392, 495 P.2d 327 (1972); *Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963).

> As long as the object sought to be accomplished is for *a public purpose,* it is for the legislature to determine the means to accomplish it . . . The fact that private enterprise may be selected to effectuate the plan . . . does not make the purpose . . . a private one.

(Italics mine.) *Port of Seattle,* at 396, citing *Miller,* at 387. A condemnation is not invalid, even though private enterprise may subsequently purchase or lease the acquired land, provided such effectuates a public purpose. *Port of Seattle,* at 397; *Miller,* at 387, 392; *see also United States v. North Bonneville,* 94 Wn.2d 827, 621 P.2d 127 (1980); *Anderson v. O'Brien,* 84 Wn.2d 64, 524 P.2d 390 (1974). Simply stated, the current test is whether the advantage to private enterprise is part of a single, inseparable plan benefiting the public. *See generally* Note, *An Expanded Use of Excess Condemnation,* 21 U. Pitt. L. Rev. 60 (1959). If so, the condemnation is constitutional.

This current interpretation of article 1, section 16 (amendment 9) simply reflects the changing nature of our society. It has been observed that:

> The principle of private ownership of land is deeply imbedded in our democratic system of government, yet it has never been denied that the principle is subject to the power of the government to take land for public use. During the first century of our constitutional society, great wealth was tied up in land and even the man of moderate wealth depended on his land for security. It is not surprising, therefore, that the power of the government to take private land was construed strictly. In our modern society most of the wealth is invested in corpo-

rate and government securities rather than in land, and while private land ownership is still an important characteristic of free government, it seems natural that the limitation on that principle, namely the power of the government to take land for public use, should be interpreted more liberally. Our experience with the democratic form of government with its separation of powers assures us that we need not fear abuse of power so long as certain safeguards surround the power.

Note, *supra* at 70. *Accord, Kansas City v. Liebi,* 298 Mo. 569, 252 S.W. 404 (1923).

Both *Miller* and *Port of Seattle* reflect those changing conditions. In *Miller,* we upheld the constitutionality of urban renewal projects whereby blighted areas, and some peripheral, unblighted areas, were condemned and later resold to private developers. Similarly, in *Port of Seattle,* we upheld a port's plan to condemn certain land, to construct air cargo facilities upon it, and then to lease them to private enterprise. In each the condemnation was lawful because the private use facilitated *a* public purpose.

*Miller, Port of Seattle,* and their predecessors are therefore not necessarily inconsistent and none bars the Westlake Project. Our cases are also not inconsistent with the general rule followed elsewhere. A synthesis of state and federal law reveals that land may be condemned:

(1) to enable government to carry on its functions, and to preserve the safety, health and comfort of the public, whether or not its individual members may use the property so taken, provided the taking is by a public body; (2) to serve the public with some necessity or convenience of life required by the public as such and which cannot readily be furnished without the aid of the government, whether or not the taking is by a public body, provided the public may enjoy such service as of right; and (3) in special and peculiar cases, sanctioned by custom or justified by the existence of unusual local conditions, to enable individuals to cultivate their land or carry on business in a manner not otherwise possible, if their success will indirectly enhance the public welfare, even though the taking is by a private individual and the public has no right to the enjoyment of the property

taken or to service from him.

*County of Essex v. Hindenlang,* 35 N.J. Super. 479, 490, 114 A.2d 461 (1955); 2A J. Sackman, *Nichols on Eminent Domain* 7–47 (3d rev. ed. 1980).

It is significant that states with constitutions similar to ours have taken a "liberal" approach. Arizona, Colorado, and Missouri appear to permit any condemnation which benefits the public. *Kansas City v. Liebi, supra; Tanner v. Treasury Tunnel Mining & Reduction Co.,* 35 Colo. 593, 83 P. 464 (1906); *Oury v. Goodwin,* 3 Ariz. 255, 26 P. 376 (1891). They do not follow the majority's stringent "public use" approach.

Furthermore, as we have frequently stated, the definition of "public use" evolves with the changing needs of society. In *Miller,* we wrote:

> it may fairly be stated . . . that judicial interpretation of "public use" has not been circumscribed in our State by mere legalistic formulas or philological standards. On the contrary, definition has been left, as indeed it must be, to the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration. Moreover, views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that to–day there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of "public use" naturally expands in proportion.

*Miller,* at 384–85, quoting *Carstens v. PUD 1,* 8 Wn.2d 136, 142, 111 P.2d 583, *cert. denied,* 314 U.S. 667, 86 L. Ed. 533, 62 S. Ct. 128 (1941).

The Westlake Project is one attempt to resolve public problems now arising. It is an attempt to revitalize downtown retail corridors, to provide needed public space, and to confer cultural benefits. It is an attempt to innovatively create a satisfying downtown environment in response to contemporary downtown problems. As acknowledged by the

trial court:

> The Westlake Project is intended by the designer and legislative body to perform some of the same functions, in the contemporary urban setting, that in earlier and simpler times were performed by public squares or commons.

Finding of fact No. 41.

The Westlake Project is therefore, in its simplest terms, a contemporary public square. Consequently, as there is authority to condemn for public squares, RCW 8.12.030, and since the private use is necessary for the plan, the project is constitutional.

### III

Conceived as such, the majority's statement that there is no statutory authority for the condemnation sought in this case is a play with words that is not accurate.

A municipal corporation has only those condemnation powers conferred to it by statute. *State ex rel. Devonshire v. Superior Court,* 70 Wn.2d 630, 424 P.2d 913 (1967); *Tacoma v. Welcker,* 65 Wn.2d 677, 399 P.2d 330 (1965). But those powers extend to the evident purpose of the legislative grant. *Id.* As we cautioned in *Devonshire,* at page 633:

> a statutory grant of such power is not to be so strictly construed as to thwart or defeat an apparent legislative intent or objective.

Accordingly, a municipal corporation has the power to take and develop land if pursuant to a statutory end. In evaluating any condemnation, "'courts look to the substance rather than the form, to the end rather than to the means.'" *State ex rel. Puget Sound Power & Light Co. v. Superior Court, supra* at 312.

There is statutory authority to condemn land for *public squares, public markets,* public parks, public auditoriums, art museums, public parking, and recreational areas. RCW 8.12.030; 35.21.020; 35.21.400; 36.34.340. These are all elements of the Westlake Project. And as reflected by the findings, the private enterprise component, which concerns

the majority, is simply the means to accomplish the public end.

While the majority concedes express statutory authority for condemnation to further all the above mentioned purposes, it insists "there is no express statutory authority for the proposed project—a retail shopping center." Majority opinion, at 629. Insistence on this frame of reference stems from the majority's judgment that the "evidence shows, as the trial court found, that *the primary* purpose of the undertaking was to promote the retail goal." (Italics mine.) Majority, at 629. It is one thing to say that the retailing aspect of the project is "substantial" and "essential" to the project. Majority, at 628. Finding of fact No. 5. This is only to express what the municipality openly avows—that the interdependence of public and private entities is required for the success of the venture. But to say the retailing aspect of the project is "the *primary purpose*" of the project is to make a judgment about the facts, not to represent them.

In *United States v. North Bonneville,* 94 Wn.2d 827, 621 P.2d 127 (1980), both sides agreed that the Town's purchase of property "for streets, parks, and service facilities constitutes a public purpose." *Id.* at 834. Nevertheless, it was also "undisputed that the 'mode of use' for a portion of the property the town wishe[d] to purchase from the Corps [was] not municipal in nature." *Id.* at 833. We found a public purpose to the proposed purchase, stating:

> [I]f the primary object is to subserve a public municipal purpose, it is immaterial that, incidentally, private ends may be advanced. Moreover, the public purposes for which cities may incur liabilities are not restricted to those for which precedent can be found, but the test is whether the work is required for the general good of all the inhabitants of the city. But it is not essential that the entire community, or even a considerable portion of it, should directly enjoy or participate in an improvement in order to make it a public one. . . . [T]he test of a public purpose should be whether the expenditure confers a direct benefit of reasonably gen-

eral character to a significant part of the public, as distinguished from a remote or theoretical benefit. (Footnotes omitted.) *Id.* at 834, quoting 15 E. McQuillin, *Municipal Corporations* § 39.19, at 31–32 (3d ed. 1970).

Unlike the court in *Bonneville,* the majority here deems the private aspect of this project is not incidental to the public uses. It concedes that if the private use were incidental, "a different question would be presented", citing *Miller, supra,* and *In re Port of Seattle, supra.* Majority, at 634. The majority's reliance on these cases, I believe, misconceives the nature of the term "incidental" as it is used in those opinions and as it has since been construed by this court. The majority interprets the term "incidental" as a quantum reference: *if most of the use is public then a small concomitant of private use may be deemed incidental.* The cases do not bear out the majority's use of the term.

In *Miller, supra,* we did state "[T]he subsequent transfer of land to private parties is . . . 'merely incidental to the main public purpose.'" *Id.* at 388. But we also stated such resale or lease provisions were "*an essential and continuing part of the public purpose.*" *Id.* at 387, quoting *Velishka v. Nashua,* 99 N.H. 161, 106 A.2d 571, 44 A.L.R.2d 1406 (1954). The private aspect of the urban renewal project at issue in *Miller* was an integral part of the public purpose, and yet we deemed it incidental.

In *In re Port of Seattle, supra,* again we stated that the lease of cargo facilities to private enterprise was "incidental to the main public purpose" of providing air cargo facilities. We stated:

> The fact that private enterprise may be selected to effectuate the plan for providing air cargo facilities does not make the purpose of providing those facilities a private one. . . .
>
> . . .
>
> Perhaps if the sole purpose of acquiring the property was to lease it to an individual or corporation for private use, its acquisition and lease would be in violation of the [constitution].

*Id.* at 396–97, quoting in part *Paine v. Port of Seattle,* 70

Wash. 294, 318, 322, 126 P. 628, 127 P. 580 (1912). The meaning of this language from *Port of Seattle* is that substantial leasing might occur to "effectuate" a public purpose. Even if there were a large number of privately leased cargo facilities, that private "means" would still be incidental to the overarching public purpose of providing air cargo facilities. While substantial and necessary for the effectuation of a public purpose, such leasing, as with the resale of property in *Miller,* would be "incidental."

More recently, in *Bonneville, supra,* we reaffirmed the true meaning of the term "incidental" in this context. In that case, we deemed "incidental" the substantial resale to private entities of property purchased by the municipality. Resale to private parties was thought "incidental" because "a large portion of the acquired property would go to undisputedly municipal uses as streets, parks, and service facilities", *Bonneville,* at 839, thus conferring "a direct benefit of reasonably general character to a significant part of the public . . ." *Bonneville,* at 834, quoting 15 E. McQuillin, *Municipal Corporations* § 39.19, at 31–32 (3d ed. 1970).

Applying these principles to this case, we must first concede the retailing aspect of the Westlake Project constitutes a substantial portion of the project; the *amount* of property to be leased by the City to be devoted to retailing is not insignificant. But the magnitude of such activity does not make it any less "incidental" to the public purpose being served. The "different question" the majority seeks to avoid through its analysis is squarely presented in this case, and it is answered by our previous cases.

"Public need, as a primary purpose behind joint projects must, of course, be recognized." *PUD 1 v. Taxpayers,* 78 Wn.2d 724, 729, 479 P.2d 61 (1971). Such a public need and use is easily identifiable in the Westlake Project. A public square in the downtown area is both needed and a valid public use for which the municipality has express statutory authority to condemn property. While the question of public use is a judicial one, even the majority concedes this is a

public use.

The municipality deemed it a necessary incident of that public use that substantial leasing to private retailers occur. That private activity is "incidental" (although both substantial and necessary) to the direct public benefit conferred by the project.

We have previously stated that determination of the means by which a public purpose is achieved is essentially a legislative question. *In re Port of Seattle,* 80 Wn.2d 392, 396, 495 P.2d 327 (1972). So it is in this case; the municipality is in a much better position than this court to determine what balance of private and public is necessary to the success of an accepted public purpose.

> What is a public municipal purpose is not susceptible of precise definition, since it changes to meet new developments and conditions of times.

*United States v. North Bonneville,* 94 Wn.2d 827, 833, 621 P.2d 127 (1980), quoting 15 E. McQuillin, *Municipal Corporations* § 39.19, at 32 (3d ed. 1970).

In meeting the challenge of changing urban conditions, municipalities need flexibility in pursuing accepted legislative goals. It is not the role of the judiciary to impose its judgment on the wisdom of those goals. Private shopping centers must conform to an extent with the public interest. *Alderwood Assocs. v. Washington Environmental Council,* 96 Wn.2d 230, 635 P.2d 108 (1981). Are we now to deny municipalities the opportunity to integrate private and public energies to serve the good of the public in our urban centers?

DOLLIVER and DIMMICK, JJ., concur with UTTER, J.