82 P.3d 701 (2004)
119 Wash.App. 738
CITY OF TACOMA, a municipal corporation, Respondent,
v.
Ronald ZIMMERMAN and Steffi R. Zimmerman, husband and wife, Appellants.
No. 29279-3-II.
Court of Appeals of Washington, Division 2.
January 14, 2004.
*702 Daryl Allan Deutsch, Attorney at Law, Bellevue, WA, for Appellant.
Cheryl Fandel Carlson, Attorney at Law, Assistant City Attorney, Tacoma, WA, for Respondent.
QUINN-BRINTNALL, A.C.J.
Ronald and Steffi Zimmerman own the Old Elks Temple on Broadway in the City of Tacoma. The Zimmermans appeal an order adjudicating a public use for the property, declaring it a blight and subject to the City's power of eminent domain. The Zimmermans claim the building is not of sufficient value to *703 be repairable and that it is more economical to demolish the building. They argue that under Tacoma Municipal Code (TMC) 2.01.060.E.8.a and TMC 2.01.060.E.8.b, the City cannot exercise the power of eminent domain, but must allow Zimmermans to retain ownership of the building and remove the blight by demolishing the building. The City claims the building is of sufficient value to be repairable because it is a key structure in the downtown historic district and that the City does have the right to obtain the property through eminent domain. We affirm.

FACTS
The Zimmermans own 10 lots in downtown Tacoma; on one of these lots sits the Old Elks Temple at 565 Broadway. The Old Elks Temple, built in 1915, was used as the lodge building for the Tacoma Chapter of the Benevolent and Protective Order of the Elks until the early 1970s. This building is a "pivotal structure" in the Old City Hall Historic Special Review District in downtown Tacoma, and thus enjoys certain protections under the TMC.[1] See TMC 13.07.110; TMC 13.07.130.E.1.C. Although the Old Elks Temple is not itself listed as a historic building on any national, state, or local list, the Old City Hall Historic District is on all three lists.
The Old Elks Temple has been unoccupied since the early 1980s. In March 2001, the City inspected the building and found it to be derelict. The City sent the Zimmermans several letters throughout the spring and summer of 2001, informing them of the required repairs and requesting a plan to make the repairs. When the Zimmermans failed to submit a repair plan, the City issued civil citations.
By September 2001, the Zimmermans had been issued at least five citations and accumulated over $1,000 in unpaid fines. On September 11, 2001, due to the "continued lack of response from [the Zimmermans] to the derelict (blighted) condition of the property," the City filed a Certificate of Complaint with the Pierce County Auditor's office. Clerk's Papers (CP) at 32. This complaint serves as notice that the City is pursuing a code enforcement action. The City's authority to file the Certificate of Complaint arises under TMC 2.01.060.E.3.f:
In the event that no response is received and penalties have accumulated in excess of $1,000.00, the City shall file a Certificate of Complaint with the Pierce County Auditor to be attached to the title of the property. A copy of the Certificate of Complaint shall be sent to the property owner.
Once the City files this complaint, it may then either move to acquire the property through a condemnation action or to demolish it:
Where Derelict Building Proceedings undertaken against a property have extended over a period of time to where it is necessary to file a Certificate of Complaint..., the Building Official may undertake one of the two following procedures to mitigate the Derelict Status of the Building:
a. Procure the Property through Eminent Domain....
b. Start Dangerous Building Proceedings.
TMC 2.01.060.E.8.
It is not clear what contact, if any, the Zimmermans had with the City in response to the citations and fines. They did determine during the summer of 2001 that it was uneconomical for them to restore the Old Elks Temple. One estimate quoted just under $3 million to renovate the building for public assembly purposes; if renovated as office space, or if the building needed seismic upgrades, the cost could be much greater. The Zimmermans sought a demolition permit.[2] The City advised them that the Landmarks *704 Preservation Commission (LPC) needed to approve their demolition plans, as the LPC must approve any exterior alterations, including demolition, of pivotal structures. TMC 13.07.140.
The LPC denied the Zimmermans' request for a demolition permit in October 2001. The Zimmermans appealed that decision to the hearing examiner and, according to their reply brief, the hearing examiner recommended reversal of the denial in December 2002, and the LPC appealed that decision to the Pierce County Superior Court (Cause No. 03-2-05048-8).
In mid-October 2001, the City Council passed Ordinance No. 26863, authorizing the City to petition to acquire the Zimmermans' property under chapter 35.80A RCW (blighted property statute) and TMC 2.01.060.E.8.a (Tacoma's blighted property ordinance).[3] And in late October, the City petitioned the court for an order determining that the property was necessary for the public use of the City "to wit, abatement and alleviation, pursuant to Chapter 35.80A of the [RCW], of blighted property in the City."[4] CP at 4.
The City plans to put the building "into the hands of a successful bidder through a request for proposal to put the building back in to viable use." CP at 140. In the meantime, it will fix the roof and the exterior to abate further deterioration. The manager of the City's building and land services division, Gary Pedersen, testified in deposition that:
It's a significant building. The purpose of our actions through the Minimum Building and Structures Code [chapter 2.01 TMC] is to seek the rehabilitation and reuse of buildings. We would continue until we found an economically viable rehabilitation of the building.

To maintain the fabric of the community is the intention, not to destroy the City.
CP at 140 (emphasis added). Pedersen named tax abatement and historic tax credits as examples of ways the City could make a development project be financially worthwhile to a prospective developer.
The City sought a court order determining that the acquisition of the property was for a public use. The superior court ruled that the property was blighted because "continued deterioration of the building is a threat to the health and safety of the public." CP at 159. The court recognized that the abatement of blight is a public use and ruled that the City could proceed with acquiring the building. The Zimmermans appeal.

ANALYSIS
The Zimmermans contend that the ordinance condemning the Old Elks Temple[5] is unenforceable. They argue that Tacoma's City Council failed to find and, in fact, could not find that the building is of sufficient value to be repairable and that the City could not condemn the property and acquire it through eminent domain.[6]
*705 We review a City's exercise of its legislative authority for a manifest abuse of discretion, usually characterized by arbitrary or capricious action. Duckworth v. City of Bonney Lake, 91 Wash.2d 19, 34, 586 P.2d 860 (1978). An act is arbitrary or capricious if it is "wilful and unreasonable action, without consideration and regard for facts or circumstances." Landmark Dev., Inc. v. City of Roy, 138 Wash.2d 561, 573, 980 P.2d 1234 (1999). "Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration." Landmark Dev., 138 Wash.2d at 573, 980 P.2d 1234 (quoting DuPont-Fort Lewis Sch. Dist. No. 7 v. Bruno, 79 Wash.2d 736, 739, 489 P.2d 171 (1971)). We presume an ordinance is valid upon enactment, and the burden of showing otherwise "rests heavily on the challenger." Louthan v. King County, 94 Wash.2d 422, 428, 617 P.2d 977 (1980). But we strictly construe statutes that delegate the State's sovereign power of eminent domain to its cities. In re Petition of City of Seattle, 96 Wash.2d 616, 629, 638 P.2d 549 (1981). Statutory construction is an issue of law, which we review de novo. Landmark Dev., 138 Wash.2d at 569, 980 P.2d 1234.
Under the TMC, after the Certificate of Complaint is filed, the City may resolve the derelict building problem in one of two ways. See TMC 2.01.060.E.8. The City may obtain the property through eminent domain when "the property undergoing the Derelict Building Procedure is of sufficient value to be repairable." TMC 2.01.060.E.8.a (emphasis added). Or the City may elect to initiate Dangerous Building Proceedings when it is "more economical to demolish the building(s) on the property." TMC 2.01.060.E.8.b.
The Zimmermans assert that the City Council erred when it failed to consider the multi-million dollar cost of repairing the building and thus failed to make a finding[7] that the building had "sufficient [economic] value to be repairable." Br. of Appellant at 5. In its brief, the City argues that the building has other "value," namely historic and aesthetic.
The City asserts that the "value" in TMC 2.01.060.E.8.a does not necessarily mean economic value, pointing out that the term is not defined under the TMC. But the very next subsection indicates that the "value" contemplated is economic value:
Where the property undergoing the Derelict Building Procedure is in a state where it is more economical to demolish the building(s) on the property, the Building Official may initiate Dangerous Building Proceedings pursuant to Tacoma Municipal Code.
TMC 2.01.060.E.8.b (emphasis added).
The City's decision must turn on an assessment of a derelict building's economic value. The Zimmermans argue that the evidence they presented established that the building does not have sufficient value to be economically repaired by an individual landowner and that, therefore, it must be found to be more economical to demolish the building, and the City is therefore required to initiate a Dangerous Building Proceeding under TMC 2.01.060.E.8.b.[8] But accepting the *706 Zimmermans' argument creates a self-fulfilling phenomenon identified by one City Councilmember as "demolition by neglect." Video Transcript, Tacoma City Council, Ordinance 26863, First Reading October 9, 2001 and Final Reading October 16, 2001 ("Video Transcript"). Whether an action is "economical" depends on whether the City's reasons for pursing a project justify the project's economic cost to the City. In enacting an ordinance allowing the City to acquire the building through negotiation or eminent domain, the City cited the historic and cultural value of the building, which has been designated a pivotal historic structure in the Old City Hall Historic District. See TMC 13.07.130.E.1.C. But, from the City's perspective, the value of the building also encompasses its relationship to the other buildings in the area and the district as a whole. This "district" view of value, economic and otherwise, is more expansive than that of the owner of a single building.[9] And it is a necessary and proper perspective from which a city, as opposed to an individual landowner, may assess economic value.
The City Council noted in the ordinance that the building is designated as a pivotal historic structure in the Old City Hall Historic District. The building's stature in the district increases the economic value of repairing the building by maintaining the continuity of the community, drawing tourists and other people to the area, and generally enhancing the City.[10] After conducting an appraisal that included consultations with an engineer and an architect, City staff testified that preserving the building was the "wisest route."[11] Video Transcript. One community representative urged the City Council to eliminate the blighted building and empty demolition sites to avoid victimizing the homeless, particularly women and children. Another warned against using the power of eminent domain in circumstances where the City did not intend to follow through with property improvement plans. City Councilmember Davis stated that the intent of the ordinance was "to preserve these ... assets for the city and to restore them to being a vital part of our city." Video Transcript. Under these circumstances, we agree with the trial court that
designation by the City Council of the Old Elks Temple as a pivotal structure pursuant to Chapter 13.07 of the Tacoma Municipal Code satisfies the requirement of TMC 2.01.060.E.8.a that a building subject to the Derelict Building procedure be of sufficient value to be repairable.
CP at 158-59.
Moreover, we find no support for the Zimmermans' assertion that the City's determination of economic value must be made from the perspective of the individual landowner. To the contrary, under the TMC, it is only after the individual landowner has failed to adequately care for his property over an extended period of time to the point that it is necessary to file a Certificate of Complaint that the City has the authority to acquire the property through eminent domain, if "the property undergoing the Derelict Building Procedure is of sufficient value to be repairable." TMC 2.01.060.E.8.a. In the alternative, it may choose to initiate Dangerous Building Proceedings when it is "more economical to demolish the building(s) on the property." *707 TMC 2.01.060.E.8.b. A landowner who allows his property to fall into disrepair endangering the community thus transfers decision-making authority over the property to the elected representatives of that community.
We hold that the City Council did not abuse its discretion when it decided to exercise its eminent domain power under the Derelict Building Procedure of the TMC and preserve the Old Elks Temple, a pivotal structure in the Old City Hall Historic District of Tacoma.
Affirmed.
We concur: BRIDGEWATER, J.
MORGAN, J. (dissenting).
TMC 2.01.060(E)(8) permits the City to exercise its power of eminent domain when a derelict building has "sufficient value to be repairable." This record is devoid of any evidence that the Zimmermans' building has "sufficient value to be repairable." I find the last four paragraphs of the majority's analysis to be strained and internally inconsistent. For these reasons, I respectfully dissent.
NOTES
[1] "Pivotal structures" are those that dominate the district, major structures "whose preeminence has not been marred by alterations which would destroy their original appearance. These strong architectural statements also possess strong historic and cultural associations." TMC 13.07.130.E.1.
[2] The Zimmermans explained in a September 2001 letter to the City's Director of Public Works that they plan a $50 million project for the land once they remove the Old Elks Temple. On it would site a Merchandise Mart, "for display by Asiatic manufacturers of their goods to the retail trade from the Western Hemisphere, who would come to Tacoma to see and order the merchandise." CP at 35. They plan to build apartments and a parking garage next to the market.
[3] It is not clear from the record exactly when the Zimmermans sought the demolition permit. They claim, without citing to the record, that they filed it before the City passed the condemnation ordinance (which was in mid-October 2001). They further claim that the City passed the ordinance in reaction to their application to demolish the building.
[4] The City sought condemnation of the entire 10 lots (equaling 4 tax parcels) "so as to not leave [Zimmermans] further damaged with an uneconomic remnant." CP at 33. They explain that what would be left (of the old Christian Science Reading Room lot) would be an "awkward piece of land with difficult topography and narrow in its frontage." CP at 138. But the court did not allow condemnation of the entire 10 lots.
[5] Ordinance No. 26863 states:

AN ORDINANCE authorizing the City of Tacoma to acquire by negotiation and/or condemnation certain blighted property commonly known as the former Elks Building, located at 565 Broadway, Tacoma, Pierce County; authorizing payment from the Building and Land Use Services Demolition Billing Fund; and declaring the taking of such land, property, interest, and rights herein described to be for a public purpose and use under the right of eminent domain, in accordance with the provisions of RCW 35.80A and [TMC] 2.01.060.E.8.a.
CP at 20.
[6] The statute granting to cities the power to "acquire title to or any interest in real and personal property for the purpose of historic preservation" specifically states that the grant does not expand cities' power of eminent domain. See RCW 35.21.395. Thus, until the Zimmermans allowed the property to decline into a blighted state, the City could not acquire it under RCW 8.12.030 and chapter 35.80A RCW. See In re Petition of City of Seattle, 96 Wash.2d 616, 629, 638 P.2d 549 (1981).
[7] The Zimmermans claim that the City Council acted contrary to law or arbitrarily and capriciously by its failure to make a finding that the Old Elks Temple had sufficient value to be economically repaired. But the methods available to the City to abate the blighted building are alternate procedures under TMC 2.01.060.E.8 and the ordinance does not require the City Council to enter specific findings before selecting an alternative. Compare former RCW 35.81.060(4) (1965) (council required to make findings before approving a community renewal project) and Apostle v. City of Seattle, 70 Wash.2d 59, 422 P.2d 289 (1966).
[8] Under TMC 2.01.060.E.8.b, the City may "initiate Dangerous Building Proceedings pursuant to [TMC] 2.01.060.F," which reads in pertinent part

The owner shall be notified that the building, structure, or property has been found to be in violation of this chapter and is dangerous. The owner shall be given 10 calendar days from the receipt of the notice to secure the building.... The owner shall be given 30 calendar days from the receipt of the notice to respond to [the City] to negotiate a plan of action.
. . . .
The [owner's] response to the City shall be a written plan for repairing or demolishing the building.
TMC 2.01.060.F.3.
[9] The City has access to financial leverage not available to individual landowners, such as historic and tax abatement incentives.
[10] Pedersen testified:

[The Old Elks Temple is] a significant building. The purpose of our actions through the Minimum Building and Structures Code is to seek the rehabilitation and reuse of buildings. We would continue until we found an economically viable rehabilitation of the building.
To maintain the fabric of the community is the intention, not to destroy the City. Demolishing the building would destroy the fabric of the City, and that's against the policies and direction of the City.
CP at 140.
[11] For a time the City held in abeyance the TMC enforcement action while it worked with Mr. Porter, who had a plan to rehabilitate and use the building. Mr. Porter was unable to strike a deal with the owners, however, and informed the City that he was no longer involved with the building. The code enforcement proceedings went forward.